397 F.2d 37
 Carlotta Mozelle BREWER and Demetria Yvonne Brewer, infants, by Oner Brewer, their father and next friend, et al., Appellants,
v.
The SCHOOL BOARD OF the CITY OF NORFOLK, VIRGINIA et al., Appellees.
 No. 11782.
 United States Court of Appeals Fourth Circuit.
 Argued January 8, 1968.
 Decided May 31, 1968.
 
 S. W. Tucker, Richmond, Va. (Henry L. Marsh, III, Richmond, Va., Victor J. Ashe, J. Hugo Madison, Norfolk, Va., Jack Greenberg and James M. Nabrit, III, New York City, on brief), for appellants.
 Leonard H. Davis, City Atty., City of Norfolk, Va., for appellees.
 Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, WINTER, CRAVEN and BUTZNER, Circuit Judges.
 BUTZNER, Circuit Judge:
 
 
 1
 Negro plaintiffs have appealed from an order approving the Norfolk, Virginia, School Board's most recent plan for the desegregation of the city's schools. Most of the plan is looked upon with favor by the plaintiffs and the United States, which was permitted to intervene. Upon consideration of the narrow areas of disagreement, the order is affirmed in part and vacated in part, and the case is remanded for further proceedings.
 
 I.
 
 2
 Nine days after the Supreme Court held in Bradley v. School Bd. of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965), that it was improper to approve school desegregation plans without considering the impact of faculty allocation on a racial basis, the district judge, sua sponte, ordered the parties to present evidence on this subject in the action pending before him.[1] In response, the school board amended its plan by providing for elimination of faculty segregation.[2] The plaintiffs complain that the district judge did not require a definition of goals and a timetable for faculty desegregation. In denying the plaintiffs' request, the district court acted upon evidence that Norfolk employs approximately 2,200 classroom teachers, of whom 133 were assigned to faculties on which persons of their race were in the minority. All senior high schools, junior high schools and half the elementary schools had some integration. The district judge recognized that the board was making determined efforts to eliminate segregation among the faculty and staff.[3]
 
 
 3
 After the district judge approved the plan, this court decided Bowman v. County School Bd. of Charles City County, 382 F.2d 326 (4th Cir. 1967), vacated and remanded on other grounds sub nom. Green v. County School Bd. of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (May 27, 1968). There we required a minimal, objective timetable for faculty desegregation. A similar requirement is appropriate for Norfolk because the geographical attendance areas for elementary and junior high schools into which the city is divided contain more than one school, leaving to the pupils and their parents a choice within the zone. This system tends to perpetuate a dual system of schools when the identity of Negro and white schools located in the same zone, can be determined by the racial composition of the faculties.[4] Lake Taylor Junior High School has 65 white teachers and 2 Negro teachers; its enrollment is 1,486 white pupils and 33 Negro pupils. Located in the same attendance area is Ruffner Junior High School, which has a faculty of 5 white teachers and 58 Negro teachers and a student body of 1,033 Negro but no white pupils. The problem is not confined to the elementary and junior high schools. Lake Taylor High School opened in 1967 with a faculty of 76 white teachers and 8 Negro teachers. In the adjacent high school attendance area Booker T. Washington High School had 95 Negro teachers and 17 white teachers. The racial composition of the student bodies corresponds to that of the faculties. Lake Taylor had 1,724 white pupils and 25 Negro pupils; Washington had 6 white pupils and 2,402 Negro pupils.[5]
 
 
 4
 The goal of faculty integration is not the allocation of teachers on either a token or a quota basis. The pattern of faculty assignment should be designed to avoid identification of any particular school as predominantly Negro or white.[6] The evidence discloses the difficulty of reaching this goal, but it does not establish that attainment is impossible. Elimination of this remnant of the city's dual system of schools should proceed on a realistic timetable set by the board, subject to the approval of the district judge.
 
 II.
 
 5
 The plaintiffs also assign error to refusal of the district court to require the board to assign pupils from Northside Junior High School to Rosemont Junior High. Northside, Rosemont and Azalea Gardens Schools serve junior high school attendance area I. Northside and Azalea Gardens are predominantly white. Rosemont is entirely Negro. Northside is overcrowded, while Rosemont has vacant classrooms. The board explained that the imbalance resulted from the destruction near Rosemont of homes for redevelopment and highways. Construction of new homes in the area is expected to fill Rosemont, and the board deemed it unwise to transfer pupils from Northside for only a year. The overcrowding at Northside has not been great enough to cause the board to reject any applicants. The faculty at Rosemont is integrated to the extent of having 8 Negro and 5 white teachers. Under the circumstances the board was not required to rectify this temporary discrepancy in the use of classroom space.
 
 III.
 
 6
 The plaintiffs allege that high school attendance area IV was gerrymandered to continue racial segregation. This area is served by Booker T. Washington High School, which at the time of the district court's decision had more than 2,000 Negro but no white pupils. The background of this controversy can be briefly drawn.
 
 
 7
 In March 1966 the district court approved with reservations a pupil assignment plan negotiated by the school board, the plaintiffs, and the United States. To incorporate a new high school into the system, the board found it necessary to amend the plan for the 1967-1968 school year by creating five high school attendance areas, each encompassing approximately 2,000 pupils. Area boundary lines conformed in part with the boundaries of the city's planning districts and natural boundaries. The plan provided that pupils living in area I (Granby), II (Norview), III (Lake Taylor) and V (Maury) would attend the high school serving their area. Granby and Norview were predominantly white. It was anticipated that Lake Taylor would also be white. Maury was predominantly white but was in danger of becoming resegregated. In contrast, area IV (Washington) contained about two-thirds of the city's Negro high school pupils and only a few white pupils. The proposed plan allowed pupils living in area IV (Washington) to choose any one of the city's high schools other than Maury.
 
 
 8
 Parents of pupils living in area II (Norview) and area V (Maury) were permitted to intervene upon complaint that they were denied the same right of transfer as pupils living in area IV (Washington). The district judge, finding merit in their position, disapproved the plan.[7] He suggested three alternatives. First, freedom of choice to all high school pupils with reassignment if a school became overcrowded. Second, consolidation of area III (Lake Taylor) and area IV (Washington). Third, a strict geographical plan of assignment with each pupil being required to attend the high school in the area where he lived. The court observed that consolidation of areas III and IV, the second alternative, would eliminate a highly controversial boundary line which separated white and Negro residential neighborhoods in these areas. He also called to the attention of the school board that adoption of strict geographical zoning would risk an attack upon the validity of the plan because of segregation in area IV (Washington).
 
 
 9
 Despite the precautionary remarks of the district judge, the school board adopted a geographical plan of assignment without modifying the boundaries of the existing high school attendance areas, and required all high school pupils to attend school in the area in which they resided.[8] The plan assigned to the Washington School all but 1,230 of the city's 3,632 Negro high school pupils and excluded from Washington School all but 90 of the 7,235 white high school pupils.[9] For all practical purposes it put an end to the progress that Norfolk had been making in integrating its high schools.
 
 
 10
 The district court approved the plan, pointing out that neither the plaintiffs nor the United States had accepted the court's invitation to redraw the controversial boundary separating areas III and IV. However, the burden to come forward with suggestions for a new boundary was not upon the plaintiffs and the United States. Generally, a meaningful change in one line requires compensating changes in a substantial part of the plan. It was apparent that the inevitable result of the school board's plan would be the segregation of pupils in area IV (Washington). In fact the district judge specifically called this problem to the board's attention. With this background, the board's rejection of the alternatives suggested by the court that would lead to less segregation and its decision to adopt a geographical zoning plan without adjusting boundary lines that had been drawn for a modified freedom of choice plan, raised an inference of discrimination that required the board to justify its conduct by clear and convincing evidence. Cf. Chambers v. Hendersonville City Bd. of Educ., 364 F.2d 189, 192 (4th Cir. 1966). This it has not done.
 
 
 11
 In Gilliam v. School Bd. of City of Hopewell, 345 F.2d 325 (4th Cir.), vacated and remanded on other grounds, sub nom. Bradley v. School Bd. of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965), we approved geographical zoning for the assignment of pupils. We also have said that such a system may not serve as a guise for gerrymandering zones to foster racial segregation. Wheeler v. Durham City Bd. of Educ., 346 F.2d 768, 774 (4th Cir. 1965).[10] The boundaries of area IV are drawn so Negro students who live nearer a predominantly white school are assigned to the more distant Washington School, while white pupils who live nearer Washington are assigned to a more distant predominantly white school. Sometimes similar results are caused by natural boundaries that separate the zones, e. g., Gilliam v. School Bd. of City of Hopewell, 345 F.2d 325 (4th Cir.), vacated and remanded on other grounds, sub nom. Bradley v. School Bd. of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965), but here the boundaries selected by the board offer no natural impediment. They are no obstacle to elementary and junior high school pupils whose attendance areas are not so rigorously segregated and bounded. Moreover, the board departed in places from natural boundaries and in other places from the planning district lines. The board should be afforded the opportunity to submit a plan with more rational lines and to consider alternative plans for pupil assignment.
 
 
 12
 City planning districts used to fashion school attendance areas show wide variation in white and Negro residential distribution. Five residential planning districts have no Negro residents; 51 have less than 15% Negroes; 7 districts are mixed; and 17 have more than 80% Negroes. Upon remand the district court should determine whether the racial pattern of the districts results from racial discrimination with regard to housing. If residential racial discrimination exists, it is immaterial that it results from private action. The school board cannot build its exclusionary attendance areas upon private racial discrimination.[11] Assignment of pupils to neighborhood schools is a sound concept, but it cannot be approved if residence in a neighborhood is denied to Negro pupils solely on the ground of color.[12]
 
 IV.
 
 13
 The district court approved a site near the present Washington School for erection of a new high school. The plaintiffs assert that this will continue indefinitely the segregation of Negro high school pupils. The district judge's approval was based largely on the school board's expertise in site location and the fact that a committee of Negro citizens urged construction near the old school. These factors should be given weight, but they are not controlling. In Wheeler v. Durham City Bd. of Educ., 346 F.2d 768 (4th Cir. 1965), we held that a school construction program is an appropriate matter for court consideration and directed that this be developed upon remand. We will follow the same course here. We do not hold that the new school cannot be built near the old, but many other factors in addition to the site must be considered to determine whether the new school is located to perpetuate segregation. Among these are the new school's attendance area, whether the school will be designed to accommodate only Negroes or whether it will include white pupils who live nearer to it than to the predominantly white high schools they now attend, whether the racial composition of the faculty will mark it as a Negro school and what practical alternative sites and assignment plans, if any, are available. This catalog is not complete. Doubtless other pertinent factors will be suggested to court and counsel. From all of them the court objectively can determine whether the new school will take its place in a non-discriminatory system or continue de facto the city's former de jure dual system of white and Negro schools.
 
 
 14
 Affirmed in part, vacated in part, and remanded.
 
 
 
 Notes:
 
 
 [1]
 See Brewer v. School Bd. of City of Norfolk, 349 F.2d 414 (4th Cir. 1965), which vacated an order approving the school board's plan and remanded the case for consideration in the light of this court's decisions announced pending appeal. For citation of earlier cases involving the Norfolk schools see Hill v. School Bd. of City of Norfolk, 282 F.2d 473, 474 n. 1 (4th Cir. 1960)
 
 
 [2]
 The provision states:
 "The School Board of the City of Norfolk recognizes its responsibility to employ, assign, promote and discharge teachers and other professional personnel of the Norfolk City Public School System without regard to race or color. It further recognizes its obligation to take all reasonable steps to eliminate existing racial segregation of faculty that has resulted from the past operation of a dual school system based upon race or color.
 "In order to carry out these responsibilities, the School Board has adopted the following program:
 "Teachers and other professional personnel will be employed solely on the basis of qualifications and without regard to race or color.
 "In the recruitment and employment of teachers and other professional personnel, all applicants and other prospective employees will be informed that the City of Norfolk operates a racially integrated school system and that the teachers and other professional personnel in the System are subject to assignment in the best interest of the System and without regard to their race or color.
 "The Superintendent of Schools and his staff will take affirmative steps to solicit and encourage teachers presently employed in the System to accept transfers to schools in which the majority of the faculty members are of a race different from that of the teacher to be transferred. Such transfers will be made by the Superintendent and his staff in all cases in which the teachers are qualified and suitable, apart from race or color, for the positions to which they are to be transferred.
 "In filling faculty vacancies which occur prior to the opening of each school year, presently employed teachers of the race opposite the race that is in the majority in the faculty at the school where the vacancy exists at the time of the vacancy will be preferred in filling such vacancy. Any such vacancy will be filled by a teacher whose race is the same as the race of the majority on the faculty only if no qualified and suitable teacher of the opposite race is available for transfer from within the System.
 "Newly employed teachers will be assigned to schools without regard to their race or color, provided, that if there is more than one newly employed teacher who is qualified and suitable for a particular position and the race of one of these teachers is different from the race of the majority of the teachers on the faculty where the vacancy exists, such teacher will be assigned to the vacancy in preference to one whose race is the same."
 
 
 [3]
 More recent statistics, not available to the district judge, show further progress. Forty-nine of the city's 59 elementary schools had some faculty integration
 
 
 [4]
 Kier v. County School Bd. of Augusta County, 249 F.Supp. 239, 245 (W.D.Va. 1966)
 
 
 [5]
 These statistics were not compiled until after school opened in September 1967
 
 
 [6]
 United States v. Jefferson County Bd. of Educ., 380 F.2d 385, 394 (5th Cir.), cert. denied, 389 U.S. 840, 88 S.Ct. 77, 19 L. Ed.2d 104 (1967)
 
 
 [7]
 The action of the district court in declining to approve this plan is not before us, and we do not pass upon its merits. None of the parties has assigned error on this issue and the intervenors are not parties to this appeal
 
 
 [8]
 Prospective seniors who were presently attending schools outside their residential areas were permitted to finish their schooling without change. Other pupils, who under the city's previous freedom of choice plan had elected to attend schools outside of their areas, were required to return to the schools in their residential areas
 
 
 [9]
 Although these statistics were not compiled until after school opened in September 1967, they do not differ materially from the estimates that were made in the spring of 1967 when the case was heard
 
 
 [10]
 Accord Brooks v. County School Bd. of Arlington County, 324 F.2d 303, 308 (4th Cir. 1963), Taylor v. Board of Educ. of City School Dist. of City of New Rochelle, 294 F.2d 36, 39 (2d Cir.), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961). Cf. Gomillion v. Lightfoot, 364 U.S. 339, 347, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960)
 
 
 [11]
 Cf. Commonwealth of Pennsylvania v. Board of Directors of City Trusts of City of Philadelphia, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); Marsh v. State of Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); Reitman v. Mulkey, 387 U.S. 369, 378, 87 S.Ct. 1627, 18 L. Ed.2d 830 (1967) (dictum); Griffin v. State of Maryland, 378 U.S. 130, 136, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964) (dictum); Watson v. City of Memphis, 373 U.S. 526, 538, 83 S.Ct. 1314, 10 L.Ed. 2d 529 (1963) (dictum)
 Fiss, Racial Imbalance in the Public Schools: The Constitutional Concepts, 78 Harv.L.Rev. 564 (1964-65).
 
 
 [12]
 Cooper v. Aaron, 358 U.S. 1, 17, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958)
 
 
 HAYNSWORTH, Chief Judge (dissenting in part):
 
 15
 This case illustrates the kind of difficult problems that arise when school boards deprive pupils and parents of freedom of choice* in assignments and a tendency of courts to become overly involved in the administration of school systems. I think freedom of choice highly desirable to permit pupils to extricate themselves in school from the effects of segregated housing patterns, but I am no school administrator, and when a school board turns to a plan of strict geographic assignments, a plan frequently urged upon us by Negro plaintiffs, I think this Court should give due credit to a school board, such as Norfolk's, which has an outstanding history of conscientious endeavor to meet all of the requirements of the law and to a district judge who is much more familiar with the local situation than we and who has been steadfast in support of the law.
 
 
 16
 I would have no objection to a remand of the case for another look at the Area IV high school boundary, though I think the court should recognize that some credit is due the history of that boundary and the demonstrated good faith of the school board. That is not to say that the court should not examine the boundary and consider other possible alternatives, but the problems involved in drawing boundaries are not susceptible to mechanical answers. Population densities are under constant change, and it is simply impossible to draw boundaries so that every pupil will go to the school nearest his home unless some schools are to be greatly overpopulated while others are greatly underpopulated. Many factors will influence the location of the boundary, and the court's role, of course, is limited to a determination that racial consideration was not one of them.
 
 
 17
 The court seems to me to go much too far in suggesting that the school board must involve itself in questions of private discrimination in housing and that geographic zoning is impermissible if it exists. If city planning district boundaries were drawn on racial lines, I, of course, agree that they may not be used as a factor in drawing the boundaries of school attendance zones, but a school board cannot police private discrimination in housing. Such discrimination, in part, has been made unlawful by the Civil Rights Act of 1968,[1] which will be enforced in Norfolk, as elsewhere, but to the extent that some such discrimination in the sale and rental of housing continues it is completely beyond the power of the board to control. School boards, of course, must take account of many conditions they cannot control, as we recently held in Coppedge,[2] but private discrimination in housing has not heretofore been held to proscribe the assignment of pupils by geographic attendance zones, so long as the zone boundaries are determined by objective criteria unrelated to racial housing patterns. Again, while I have a preference for some form of freedom of choice, I do not think the court should stretch constitutional doctrine to compel school boards to prefer such plans to geographic zoning plans which meet the standards we have prescribed.
 
 
 18
 Finally, with respect to the integration of faculties, while we have held the provision of some time table appropriate, we have done so in cases in which there was some reason to believe there was some reluctance in the school board to proceed as rapidly as it might. Norfolk has achieved much more than token faculty integration. Further progress should be expected and is being achieved at a rate which may well be more rapid than an inflexible time table would require. In a case of this sort, I would not limit the discretion of the District Judge who, with the cooperation of the Norfolk School Board, has been achieving results much more deserving of commendation than of small faultfinding.
 
 
 
 Notes:
 
 
 *
 While the opinions in this case were not announced until May 31, 1968, they were written prior to the opinions of the Supreme Court in Green et al. v. County School Board of New Kent County, Virginia et al., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (decided May 27, 1968) and related cases
 
 
 [1]
 P.L. 90-284; 82 Stat. 73
 
 
 [2]
 Coppedge v. Franklin County Board of Education (April 8, 1968) 4 Cir., 394 F. 2d 410
 
 
 ALBERT V. BRYAN, Circuit Judge (dissenting):
 
 19
 I think the court once again acts as a school board and as a trial court, and now is about to act as a city planning commission. In disagreeing with the majority opinion I do not overlook the ability manifest in its presentation; but this admirable craftsmanship deserves a worthier destiny.
 
 
 20
 The clearest example of our usurpation appears in the instructions to the District Court to investigate the Norfolk zoning regulations to see why the Negroes live where they do. In this the District Court is directed to assay for its bona fides the Norfolk Planning Commission's layout of the city into residential districts. The District Court is told to scrutinize the housing in the area where Negroes live, if near a public school, with the suggestion that the location of their habitat may be the result of "racial discrimination with regard to housing".
 
 
 21
 Concededly, the question of what is the "neighborhood" in a neighborhood school assignment plan is not dependent upon, or determined by, planning districts. In assuming they were so utilized, the majority is in error. They were simply used to define the location of the residence of a pupil. The school zones were measured not from the planning lines, but from each school; the school's site was taken as the center and the school zone circumscribed about it with an almost constant radius. Indeed, planning zones and school zones are too tenuously related for one to be a guide for the other. City planning, of course, involves the allotment of urban, suburban and sometimes more removed space for commercial, industrial and residential uses.
 
 
 22
 City planners have never been, and are not now, able to create a Negro neighborhood. This is so even in urban renewal or public housing projects. A planning commission is confronted with residences predating municipal planning and with residences to be erected in new sections. As to the former, obviously no amount of zoning can change them and there is no opportunity for racial discrimination. As to the new areas, the only power of the planners toward regulating who shall live there is a restriction of the minimum lot or tract size and, possibly, the type of dwelling-house. Neither factor affords an opportunity for racial discrimination. These are economic considerations; they are not Constitutionally offensive because a Negro may not have the means to reside there.
 
 
 23
 But if the old or existing neighborhoods are to be investigated for "racial discrimination", as the majority now orders, and assuming that in a school suit the judgment of the city planners may be litigated, the canvass ordered of the District Judge would be vast and meaningless. It would start with a separate consideration of the occupants by race. It would include the Negroes' preference or financial ability to locate elsewhere; whether they had ever been refused residence in another place; how they happened to settle where they have; the nature of their possession or estate and how it was acquired, i. e. by inheritance or purchase, so as to see if this housing was forced upon them; the attitude of the planners and the City Councilmen who approved the planning; and a myriad other explorations. Then, in the end, who would decide whether the Negroes have been aggrieved and on what criteria?
 
 
 24
 A similar sweeping reevaluation is applied to the conclusions of the School Board and the District Court. Despite reluctance, the stubborn fact is that the opinion now overrules every finding of the District Judge save one, the insignificant ruling on transfers from the Northside to Rosemont school. Then the majority substitutes its views of the geographical and residential characteristics of Norfolk for those of the Norfolk School Board and of a District Judge long resident in Norfolk. With the utmost familiarity of the circumstances there, the Board and the Judge have each painstakingly and conscientiously endeavored to act without social discrimination. The Civil Rights Division of the Department of Justice made no objection whatever to the District Judge's decision, although requested to express itself. But all this intimate knowledge is now scrapped in favor of the majority's own appraisal of Norfolk.
 
 
 25
 In this, the majority insinuates that the School Board has put faculty integration on only a token or quota basis. Further, it intimates that the Board, without objection of the District Judge, is gerrymandering school districts. Also there is the implication that the Board's aim, with the acquiescence of the Judge, is to locate or use other ways to identify the schools as Negro or white. But this is not the record.
 
 
 26
 Faculty ratios have been progressively improved. The District Court found these unquestionable facts: "When the schools opened on September 6, 1966, the faculties in all eleven junior high schools were integrated; the faculties in all four senior high schools were integrated; the faculties in twenty-eight of the fifty-six elementary schools were integrated. We believe that anyone will agree that such action is beyond the call of `deliberate speed' bearing in mind that the faculty desegregation issue was finally settled by the Supreme Court on November 15, 1965."
 
 
 27
 The Board's plan for desegregation now decried by the majority is well undergirded by actualities and expert opinion. It was not initiated by the Board but by the Judge. Although he alluded to dangers — and they exist in every plan — overall he thought the plan not unfair or unsound. The evidence reveals a just foundation for the Board's determination as well as for the Judge's approval. Especially in locating new, or adding, school structures the Board is put in an impossible predicament. If the building is sited in a Negro neighborhood, the decision is assailed as fostering a "Negro" school; if it is placed at a distance, it is attacked as discriminatorily inaccessible. The Judge saw no reason to override the Board; nor did the United States. I hardly think we know better than all of these.
 
 
 28
 I wonder if a presumption of good faith in the acts of those in authority might sometime be indulged instead of the inference of evil motive.
 
 
 29
 A preference by an appeals court for its own findings in subordination of the trial court's is forbidden by F.R.Civ.P. 52(a). Certainly it is presumptuous for us to say that the District Judge was "clearly erroneous". I would affirm the District Court throughout.