Leola Pearl BECKETT et al., Plaintiffs,

and

Carlotta Mozelle Brewer et al. and United States of America, Plaintiff-Intervenors,

v.

The SCHOOL BOARD OF THE CITY OF NORFOLK et al., Defendants.

Civ. No. 2214.

United States District Court
E. D. Virginia,
Norfolk Division.

May 19, 1969.

---

Hill, Tucker & Marsh (Henry L. Marsh, III), Richmond, Va., Victor J. Ashe and J. Hugo Madison, Norfolk, Va., for plaintiffs and certain individual intervenors.

J. Harold Flannery and Charles K. Howard, Civil Rights Division, U. S. Department of Justice, Washington, D. C., for United States of America, plaintiff-intervenor.

Leonard H. Davis, City Atty., Norfolk, Va., and Willcox, Savage, Lawrence, Dickson & Spindle, Toy D. Savage, Jr., Norfolk, Va., for School Board of City of Norfolk and other defendants.

WALTER E. HOFFMAN, Chief Judge.

## MEMORANDUM

In a matter involving the better part of seven days of testimony, to say nothing of the multitude of exhibits and pretrial proceedings, prudence dictates that a considered opinion is in order. Nevertheless, compelling reasons are presented which require a decision at this particular time in order to alleviate, subject to appellate review, the unrest existing among school children and their parents in the City of Norfolk and, in addition, to expedite an appeal which has been clearly indicated. Reserving the right to amplify or modify the views expressed herein following the completion of the transcript, the Court, assured of the soundness of its conclusion, has orally directed an order approving the interim plan for the 1969–70 school year as submitted by the School Board, calling for a continuation of the modified freedom-of-choice plan in the elementary and junior high schools and the adoption of the proposed geographic zone plan for the senior high schools. The submission of the final plan will remain as heretofore ordered at the hearing on April 2, 1969, to-wit, on or before June 23, 1969. The time scheduled for filing objections to the final plan is July 7, 1969, at which time a pretrial conference will be conducted. A hearing on objections, if any, is fixed for September 3, 1969.

Since the Norfolk schools reopened on February 2, 1959, following the school-closing days in September 1958, the citizens of Norfolk have accepted integration with minimal complaint. Progressively, as court decisions have broadened the scope of the terms "desegregation" and "integration," the School Board has in good faith endeavored to keep up with the sweeping changes. Indeed, the School Board and its administrative staff now recognize that research has developed the conclusion that desegregated schools, where the majority in attendance are white, are beneficial to white and black alike. However, this same research leads to the conclusion that where the majority in attendance at a particular school are black, the Negro does not better himself and the white child suffers appreciably.[1] With this in

1. The so-called optimal plan of desegregation as suggested by counsel for the School Board on April 2, 1969, is predicated upon the results of these various research projects. To the extent reasonably possible, the School Board's permanent plan contemplates that from 20% to 40% of the Negro children will attend the racially mixed schools, thus leaving a majority of white children in most schools which, according to research studies, is conducive to sound educational principles. While the optimal plan will not result in all schools being integrated to the extent mentioned above, the plan does contemplate that every child in the school system will attend an integrated school for a minimum of three of the twelve years of public education. All of the foregoing will be amplified in a further discussion of the proposed optimal plan of desegregation.

mind, the School Board approached the difficult problems confronting it following the remand in Brewer v. School Board of City of Norfolk, Virginia, 397 F.2d 37 (4 Cir., 1968), rehearing en banc denied on or about October 7, 1968. The majority opinion in that case has been described by the undersigned as vague and confusing in that it sets forth excerpts from many decisions but establishes no guidelines for accomplishing the objectives stated and, additionally, imposes an impossible burden upon the Court and the School Board.

*Brewer* was decided four days after the Supreme Court handed down its opinions in Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), Raney v. Board of Education, 391 U.S. 443, 88 S.Ct. 1697, 20 L. Ed.2d 727 (1968), and Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). Confronted with a new twist in the law, the School Board applied for a rehearing en banc which was denied on or about October 7, 1968. The mandate was received by the district court on October 9, 1968.

Counsel did not request any action. Personal problems involving illness delayed immediate action by the judge. On November 29, 1968, an order was entered *sua sponte* convening a pretrial conference on December 27, 1968, and calling for specific information relative to (1) the minimal objective timetable for faculty desegregation, (2) the location, relocation, construction or reconstruction of Booker T. Washington High School, (3) counsel's interpretation of *Brewer*, (4) the production of the report relative to the site location of the new Booker T. Washington High School as prepared by the expert employed by the Civil Rights Division following the district court opinion in *Brewer*, (5) a required statement by the NAACP and the Civil Rights Division to be made at the pretrial conference as to objections, if any, to the existing plan with respect to the elementary and junior high schools; this due to the fact that *Brewer* dealt only with the senior high school plan, and (6) the required disclosure at the pretrial conference of the School Board's plans or contemplated plans relating to construction of future schools, subject to one limitation.

On December 19, 1968, the School Board filed its response in compliance with the order of November 27, 1968, and furnished the details as to (1) and (6) above.

At the pretrial conference on December 27, 1968, (a transcript of which is available), the Civil Rights Division requested,[2] with the concurrence of the NAACP and the School Board, a continuance of the hearing to permit "good faith" negotiations looking forward to the entry of a consent order. While expressing grave doubts as to the ability to reach an agreement and warning counsel that any delay would place this case in a posture of delaying any controversial changes for the 1969–70 school session,[3] the Court granted the continuance until February 15, 1969. On Feb-

---

2. Mr. Flannery (Civil Rights Division):—
"Might it be possible, sir—we are very hopeful that the issues in dispute can be narrowed drastically so as to save the Court's time when we come to hearing. *I am confident that all issues can be disposed of without hearing.*"

At the subsequent hearing on January 2, 1969, Mr. Flannery retracted this statement.

3. "The Court: Now, these are matters that if you have any hope of revising anything for the school year beginning 1969, that is, September, 1969, we must act with expedition. If I rendered a decision in this case in January, whatever there would be to decide, it is doubtful that you [Mr. Ashe, NAACP counsel] could —and I say 'you'—you or the School Board or the United States could get the matter to the Court of Appeals for argument before May or June, and, of course, if they then took another five months to decide it, we would be past the school year, and as you gentlemen know, from time immemorial, when we first met here, I do not mind changing the procedures a reasonable time in advance of the beginning of any school year, but you are just knocking on the wrong door when you ask

ruary 6, 1969, an agreed order was entered extending the time for further conferences until March 14, 1969. On or about the latter date, the Court received letters from all counsel requesting a further pretrial conference. By order dated March 17, 1969, the pretrial conference was scheduled for April 2, 1969.

Following the pretrial conference on December 27, 1968, the NAACP and Civil Rights Division filed substantially identical objections to the seven school construction projects contemplated for future new schools. As to seven contemplated modifications and renovations to existing school buildings, objections were interposed to "Classrooms to Accommodate Kindergarten Pupils Citywide," but this is not of consequence at this time as this proposal has not been sufficiently formulated. With respect to the seven projects involving new construction, on the last day of the hearings (May 9, 1969) counsel for all parties agreed that the Camp Allen Elementary School could go forward and objections to this project were withdrawn. The remaining items have not been resolved, but will be included in the School Board's final plan to be submitted on or before June 23, 1969. It is conceded by all that the resolution of site locations, capacity, etc., of these new schools is an integral part of any plan respecting school desegregation.

On or about January 6, 1969, objections were filed to the assignment procedures as to all schools, and to the School Board's action of December 17, 1968, fixing an objective timetable for faculty desegregation beginning with the 1970–71 school year. Subsequently, on April 10–11, 1969, further objections were filed to the interim plan proposed by the School Board, and which is now before the court.

On April 2, 1969, counsel for the School Board verbally presented plans for a long-range attempted solution to the desegregation problem which all witnesses concede is complex. As an interim measure, in an effort to comply with one plausible interpretation of *Brewer*, the senior high school eastern line dividing the Washington and Lake Taylor zones was adjusted to bring approximately 250 more Negro children into Lake Taylor Senior High School. Moreover, such a change would greatly relieve the overcrowded condition at Washington Senior High School. Other line changes were made to place more Negroes in Granby High School, thus relieving the rapidly resegregated Maury High School, and to compensate for the changes heretofore mentioned. However, with the majority in *Brewer* demanding hearings and court approval of school construction projects, absent approval of the NAACP and the Civil Rights Division, the problem presented with respect to the essentially all black Washington High School was insoluble at this time.

As the testimony developed throughout the extensive hearings, one dominant factor of disagreement appeared. The Civil Rights Division and the NAACP do not appear to basically disagree with the principles and proposed optimal plans submitted by the School Board except to say that there should be more integration. They counter by saying that the only solution is "bussing" (sometimes referred to as "busing"). If this is a *solution* and if it is required by constitutional mandate, this Court agrees that mandatory bussing is the only way in which all schools in the Norfolk system may become racially balanced or totally desegregated, and, with respect to a few schools, racially integrated. Not even the pairing of schools can accomplish desegregation of all schools. If we may disregard the cost, the matter of convenience, the time and expense of transportation, the neighborhood school, the soundness of an educational system, the disruption of extracurricular activities involving after-school hours, public opinion in general, and many other fac-

me, as a federal judge, to disturb a school year that has gone past the time

when they can effectively change during that particular school year."

tors, it is possible to adopt the plan advanced by the Civil Rights Division, although even then it could not possibly be put into operation by September 1969 because of transportation problems hereinafter mentioned.

During all the conferences between the attorneys, the school administrators, the distinguished Chairman of the School Board, and other educators, including an expert from HEW and another from the University of Virginia, counsel for the NAACP and the Civil Rights Division failed to produce any expert in the education field to offer any suggestions. It was the School Board who brought in the experts from HEW and the University of Virginia. The Civil Rights Division did, however, come forward with a plan at the hearing on April 24–25, 1969, prepared by Dr. Michael Stolee of Miami, Florida. While the qualifications of this educator are not disputed, the plan submitted is a sad example of a "rush job" with no thought of the consequences if adopted. Indeed, Dr. Stolee essentially concedes that his sole purpose was to present a plan with a maximum degree of desegregation in as many schools as possible.[4]

The backbone of the Civil Rights plan lies in bussing. Children attending West Elementary School (which would be abolished) would be transported past two other elementary schools to attend Coleman Place Elementary School, an estimated distance of four miles. Children located in Berkley and now attending Washington Senior High School would board a bus, passing in the proximity of both Washington and Maury High Schools, to attend Granby High School, an estimated distance of five to six miles. That are many other like examples which can be cited by reference to the transcript [5] and exhibits.

Aside from the inconvenience and substantial destruction of the education system, the cost is an insurmountable objection. Bussing for the purpose of permitting a relatively few Negro children to attend a predominantly white school is

4. To achieve racial desegregation at Washington High School, Dr. Stolee proposes that Washington and Lake Taylor be paired in a most unusual manner. He suggests that Washington be open only to tenth-grade children, and that Lake Taylor be open only to eleventh and twelfth-grade children. From an educational standpoint, all experts agree that this proposal is unsound. This suggestion adequately demonstrates that racial motives have far exceeded the necessity for sound education of children in the minds of Dr. Stolee, the representatives of the Civil Rights Division, and the NAACP. Under such circumstances, what can be done for the child who fails one or two subjects at Washington? Is he to taxi back and forth between the two schools?

5. The transcripts of the proceedings of April 2, 22, 23, 24, 25, 28, May 7, 8 and 9, have not been prepared as of the time of this memorandum. Nothing was suggested at any pretrial hearing as to the necessity of daily copy or an expedited transcript. Neither the Court nor counsel for the School Board had been advised that the Civil Rights Division would submit an alternative plan as suggested by Dr. Stolee. After several days of extensive testimony, the Court called counsel's attention to the fact that the transcript could not possibly be completed in time to take an affective appeal which would result in changes for the 1969–70 school year. For two days thereafter the Civil Rights Division provided a substitute reporter, but all other hearings were reported by the official reporter. This Court has always been willing to accept the services of a competent substitute reporter or a daily copy arrangement when counsel are willing to provide same at their expense, there being no funds available to a judge to order same. The Court is also cognizant of the priorities accorded to Civil Rights cases, including school matters, but there are equal priorities involving criminal appeals, etc., which are a source of considerable concern to trial and appellate courts and, as this Court understands the priority rule, criminal appeals are probably entitled to the highest priority. In any event, the reporter was instructed to follow the customary priority practice which has existed for many years. The Court did offer to accept a competent substitute reporter, if provided at the expense of the Civil Rights Division and/or the NAACP, thereby releasing the official reporter for the purpose of preparing the trancript.

not uncommon throughout the nation. For example, a research report entitled "A Study of the Education Effectiveness of Integration" in Buffalo, New York (the Buffalo report) reflects that 1,200 Negro pupils were intentionally transported to schools composed primarily of white children. The cost, mileage involved, and source of funds are not disclosed.

Turning to Norfolk, we find an entirely different picture. Based upon uncontroverted evidence certain statistics appear. The children, all riding within a limited zone,[6] ride for half-fare[7] through the purchase of school tickets. A round-trip fare for school children is 25 cents. There is no subsidy provided by the local, state or federal governments, and each child must pay his own fare by surrendering a student bus ticket. During the 1968–69 school year 8,165 children will have each day ridden the public transportation provided by the Virginia Transit Company. The total daily mileage for school bus transportation is 2,121. The gross revenue per annum from school children is $367,438, but the cost of operation is $417,312, or an annual net loss of $49,874.[8] The interim plan advanced by the School Board will, in itself, require an estimated additional 500 senior high school pupils to be transported. Thus, we arrive at a conclusion that, under the interim 1969–70 plan, approximately 8,500 children per day will be transported by the Transit Company.

The figures presented herein are predicated upon the assumption that, for 1968–69, an estimated 14,400 pupils live more than one mile from the nearest school or otherwise have no safe walking route to school.[9] Of this number, approximately 8,000, based on the sale of bus tickets, ride the Transit Company bus. Under the Civil Rights proposal, an estimated 22,450 children will be living more than one mile from the designated school or would otherwise have no safe walking route to school. Therefore, the total number of children per day potentially using bus transportation will be more than two and one-half times as great as the contemplated use for 1969–70 under the interim plan, and nearly three times as great as under the 1968–69 plan.

Assumptions such as the foregoing are admittedly rough estimates. It appears that, for 1968–69, perhaps 56% of the children falling outside the one-mile category used bus transportation. The record does not reflect why figures were submitted on a projected 75% use of Transit Company facilities for the estimated 16,850 students in this group under the Civil Rights plan. Even if the figures are discounted to reflect a more accurate picture, the added cost is tremendous. And the pertinent question is posed, where is the money coming

6. A few exceptions appear with respect to parochial schools involving a handful of pupils.

7. What this rate will be with increased mileage, hours, etc., is not known.

8. While the record is not explicit, it is a known fact that the Transit Company's agreement with the City of Norfolk provides for a maximum return of 6%. Since the Transit Company has never been able to attain this return, the City indirectly subsidizes the school operation to the extent of the loss mentioned, but this is not a direct expenditure by the City. The point is relevant only to suggest that, if the Civil Rights plan is adopted, it is obvious that a new agreement will have to be negotiated.

9. Apparently it is contemplated that bus transportation may be limited to children living beyond a one-mile limitation. Questions may arise as to the propriety or legality of such a limitation. If the figures are used under the assumption that no child living within one mile from the school will desire bus transportation, it is believed that a survey of the use of buses may be in order. In this day and time children are not inclined to walk as much as a mile unless required to do so for economic reasons. An accurate survey will probably reveal the use of bus transportation by many children within the one-mile limit. Of course, if bus transportation is to be provided free of charge, the number using buses will increase proportionately.

from? If the children are to pay, the greatest loss will fall largely upon the disadvantaged group, many of whom have large numbers of school children in each family.

If bus transportation is provided to children without cost to them—perhaps through the benevolence of our nation's taxpayers—it is a safe assumption that nearly 100% of the pupils residing beyond the one-mile limit will use the bus facilities. While there may be a few who will be transported by families in private automobiles, the tendency would be to ride the bus where the ride is free. This would mean that substantially all the 22,450 pupils will be transported.

Certain statistics thus develop:

| | 1968–69 Operation | Civil Rights Plan Based Upon 75% | Civil Rights Plan Based Upon 100% |
|---|---|---|---|
| Number buses required | 65 | 193 | 257 |
| Hours of bus operation | 276 | 553 | 736 |
| Miles of operation | 2,121 | 4,424 | 5,880 |
| Cost of operation per day | $2,318 | $6,945 | $9,155 |
| Cost per student | 28.4¢ | 41.2¢ | 40.8¢ |
| Cost, operation per hour | $8.40 | $12.56 | $12.44 |

As related to the total cost of operation for 1968–69 which, as stated above, is $417,312, the Civil Rights plan predicated upon use by 75% of the children residing outside the one-mile category is $1,250,100, and with respect to 100% use the cost is estimated at $1,647,900. Even if these figures are adjusted for the reasons previously mentioned, it is a safe assumption that the *additional* cost will be a minimum of $600,000 per annum and, if free transportation is provided, the overall *additional* cost will exceed $1,000,000 per annum.

The problem is not solved even though the money is provided. The 65 buses now in daily use are interlocked with the overall transportation system. Men or women operating same on a 44-hour week must be carefully scheduled on school runs in conjunction with other public transportation available to all. The limited hours required for school transportation cannot provide free time for employees during the other hours. These are factors entirely overlooked by the zealous advocates of forced integration at any cost. With nearly three times the number of buses required for a 75% use under the Civil Rights plan, the manpower shortage becomes acute, and it should not be overlooked that the Union will have something to say about the matter.

Finally, we turn to the equipment. The buses now serving the children and the public cost an estimated $37,000 each. Since the demand for public transportation would never justify the purchase of this type of bus, any additional equipment would be wasted. The only alternative would be to turn to the typical yellow-painted school bus. Under any circumstances, these buses could not be acquired in time for use in September 1969. Either the city would be required to make the capital investment, or a long-term lease and operational ar-

rangement would have to be negotiated with the Transit Company for future years.

If the transportation problem, *standing alone*, does not justify the finding that the interim plan as suggested by the School Board must go forward for the 1969–70 school year, then the writer of this memorandum invites a solution from those more qualified to speak. It is for these reasons that, during the course of trial, the Court expressed itself freely on the subject of bussing and advised counsel that it would not be ordered by this judge.

The crux of this case lies in *bussing* and *racial balancing*. When we compare the tentative long-range optimal plan and the Civil Rights plan, the results are not materially different. Let us examine these results.

### ELEMENTARY SCHOOLS

| | Long-Range Optimal Plan | Civil Rights Plan |
| --- | --- | --- |
| Total number elementary schools | 56 | 54 [10] |
| Number 90% or more white | 18 | 14 |
| Number 90% or more Negro | 19 | 13 |
| Number, clear majority white | 17 | 15 |
| Number, clear majority Negro | 2 | 12 |

### JUNIOR HIGH SCHOOLS

| | Long-Range Optimal Plan | Civil Rights Plan |
| --- | --- | --- |
| Total number Jr. High Schools | 11 | 11 |
| Number 90% or more white | 1 | 1 |
| Number 90% or more Negro | 4 | 1 |
| Number, substantially desegregated | 6 | 9 |

### SENIOR HIGH SCHOOLS

| | Long-Range Optimal Plan | Civil Rights Plan |
| --- | --- | --- |
| Total number Sr. High Schools | 5 | 4 [11] |
| Number 90% or more white | 0 | 0 |
| Number 90% or more Negro | 1 | 0 |
| Number substantially integrated | 4 | 4 |

It has always been a problem to determine when and under what conditions a school is substantially integrated or, stated otherwise, "racially unidentifiable." The expert employed by the NAACP, Dr. Larson, expressed the view that 10% was the appropriate figure. The Civil Rights expert, Dr. Stolee, did not disagree. It is for this reason that a 90% figure has been chosen.

10. The Civil Rights plan contemplates the total abandonment of two elementary schools.

11. The Civil Rights proposal treats Washington and Lake Taylor as one high school, with Washington taking all pupils in this zone for the tenth grade, and Lake Taylor receiving all pupils in the same zone for the final two grades in senior high school.

What follows then is that the School Board contemplates a greater number of desegregated schools having a white majority which is in accord with research studies, whereas the NAACP and Civil Rights Division are urging a greater number of white children in predominantly Negro schools. As to the senior high schools, the Civil Rights Division proposes that only Granby and Norview will remain predominantly white, with Lake Taylor, Maury and Washington becoming *racially balanced* as follows:

| | | |
|---|---|---|
| Lake Taylor [12] | 47% white | 53% Negro |
| Maury | 54% white | 46% Negro |
| Washington [12] | 47% white | 53% Negro |

This brings into focus the Civil Rights Act of 1964, 42 U.S.C., section 2000c–6, authorizing the Attorney General, under certain circumstances, to institute actions which "will materially further the *orderly achievement* of desegregation in public education" after allowing the school board "a *reasonable time* to adjust the conditions." Congress further provided:

"(T)hat nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards."

Technically, at least, this action was not instituted by the Attorney General. The United States was granted leave to intervene in February 1966 and has remained a party thereafter. The authority to intervene is, however, dependent upon the Civil Rights Act of 1964. Under 42 U.S.C., section 2000c(b), the word "desegregation" is defined as:

" 'Desegregation' means the assignment of students to public schools and within such schools without regard to

their race, color, religion, or national origin, but 'desegregation' shall not mean the assignment of students to public schools in order to overcome racial imbalance."

Varying interpretations have been given to the quoted language of 42 U.S.C., sections 2000c(b) and 2000c–6. In United States v. Jefferson County Board of Education, 372 F.2d 836, 878–886 (5 Cir., 1966), an exhaustive discussion concludes:

"As we construe the Act and its legislative history, especially the sponsors' reliance on *Bell* [Bell v. School City of Gary, N.D.Ind.1963, 213 F.Supp. 819], Congress, because of its hands-off attitude on bona fide neighborhood school systems, qualified its broad policy of nondiscrimination by precluding HEW's requiring the bussing of children across district lines or requiring compulsory placement of children in schools to strike a balance when the imbalance results from de facto, that is, nonracially motivated segregation. As Congressman Cramer said, 'De facto segregation is racial imbalance.' But *there is nothing in the language of the Act or in the legislative history that equates corrective acts to desegregate or to integrate a dual school system initially based on de jure segregation with acts to bring about a racial balance in a system based on bona fide neighborhood schools.*"

The issue of de facto segregation versus de jure segregation gave rise to the remand in *Brewer*, supra. The district court was instructed upon remand "to determine whether the racial pattern of the districts results from racial discrimination with regard to housing" and that, if residential racial discrimination exists, "it is immaterial that it results from private action." While there was nothing in the *Brewer* record demonstrating anything other than *de facto* segregation,[13] the Court of Appeals drew

---

12. The percentage figures are identical for the reasons indicated in footnote 11.

13. Racial imbalance is frequently labeled "de facto" segregation to suggest that the

an inference of de jure segregation by reason of the wide variation in white and Negro residential distribution, pointing out that five residential planning districts have no Negro residents; 51 have less than 15% Negro; 7 districts are mixed; and 17 have more than 80% Negroes. Perhaps the author of this opinion invited the error by injecting the planning districts into evidence *sua sponte*. Beckett v. School Board of City of Norfolk, Virginia, 269 F.Supp. 118, 131–134 (E.D.Va., 1967) At least it invoked a controversy as is evidenced by the sharp dissents of Chief Judge Haynsworth and Circuit Judge Bryan.

In remanding this issue to the district court, the Court of Appeals does not suggest where the burden rests, what is meant by "private action" or "racial discrimination with regard to housing," nor precisely how counsel, the School Board or the Court should go about determining these matters.

The testimony presented by the Civil Rights Division falls far short of establishing that requisite governmental involvement is present. We think it clear that the planning districts throughout Norfolk have primarily grown up as a result of de facto segregation, stated otherwise, the desire of the Negro to live among Negroes and the desire of the white to live among members of the white race.

In support of its argument the Civil Rights Division points to (1) certain laws of the State of Virginia and ordinances of the City of Norfolk, the last of which went off the books in 1951, (2) the testimony of a representative of the Department of Housing and Urban Development to the effect that the locations of schools were always considered when contemplating any slum clearance or urban renewal project, (3) deed restrictions prohibiting the sale of property to persons of African descent for limited periods, including reverter clauses in a minimal number of deeds, and (4) the attitude of local real estate agents and their opposition to the Open Housing legislation of 1968. While time does not permit a detailed analysis of these points—certainly without the benefit of a transcript—it falls far short of establishing any discrimination which would be tantamount to governmental action realistically affecting residential areas.

The short answer to these questions is perhaps best demonstrated by what happened to the Brambleton area after Booker T. Washington High School was erected in 1929. The high school was located on the north side of Virginia Beach Boulevard. North of Virginia Beach Boulevard the residential area was black. South of Virginia Beach Boulevard lies the area known as Brambleton which was then all or predominantly white. Within 8 or 9 years, Brambleton became essentially all black —the blacks moved in and the whites moved out. Brambleton has remained all black since that time. If this is discrimination, then it exists in Norfolk and, indeed, throughout the entire country.

The task of tracing the history of each particular area in Norfolk would require many days of testimony, extensive research, and endless expense. Such an issue cannot be resolved without reference to a special master. According to the majority opinion of the Court of Appeals there are 80 planning districts involved. It is quite possible that a particular school or planning district may have been designated as such by reason of a slum clearance program or urban redevelopment project which may, in an appropriate situation, require action to break up de jure segregation in a school located nearby, but this does not mean that every residential area in the

requisite governmental involvement cannot be found. Fiss, Racial Imbalance in the Public Schools: The Constitutional Concept, 78 Harv.L.Rev. 564, 566, 584 (1965). More accurately, racial imbalance is used to denote fortuitous racial separation in the public schools. King, Racial Imbalance in the Public Schools: Constitutional Dimensions and Judicial Response, 18 Vand.L.Rev. 1290, 1291 (1965).

city is infected by the same disease. Moreover, while the record does not disclose this fact, an examination of all slum clearance projects in Norfolk will adequately demonstrate that they were all-Negro populated before the slum clearance program was undertaken. In all probability, the same situation exists with urban development areas. There has been no effort on the part of the Civil Rights Division to particularize any school or area and, as far as the School Board is concerned, the time element is such that it cannot be properly done, even prior to the time the optimal desegregation plan is submitted. The city planners were not called as witnesses by the parties and, if called, could at best give only the more recent history of the particular areas as the Norfolk Planning Commission does not extend back to the days of the Civil War which may, in certain areas of this old city, be an appropriate starting point. Obliged as this Court is to carry out the directions of the Court of Appeals, guidelines must be established before undertaking this momentous task.

The School Board does not profess to claim that its interim plan offers any permanent solution. Having been rebuffed by the official representatives of the Department of Justice after more than 2½ months of conferences,[14] the Board was required to go to court. They propose to file their optimal plan, including site locations for new construction, on or before June 23, 1969.

The proposal submitted by the School Board in January 1969 was thought to be possible of accomplishment by September 1969. If acceptable, it would have permitted seven full months for putting the plan into operation. However, as time went on, the opportunity to complete the many necessary details diminished rapidly. When the final rejection by the Civil Rights Division was re-

ceived on or about March 7, 1969, the School Board realized that it would be required to litigate the many issues. It then reluctantly turned to the interim plan. With all candor, both the NAACP and the Civil Rights Division agree that the School Board has, at all times, been most cooperative in providing any and all information and records desired. The only alleged lack of cooperation is that the School Board has not agreed with the conclusions that *bussing* and *racial balancing* must be accomplished. We trust that the right to disagree will not be throttled under such circumstances, especially where research adequately supports the logic of the School Board.

The Board's long-range optimal proposal is in evidence. Six cardinal principles are advanced and, as indicated above, the NAACP and the Civil Rights Division only express disagreement with these basic principles as to the results to be achieved. These principles are:

"(1) Desegregation can provide the conditions for an improved educational program for the City as a whole, but in order to achieve and maintain the benefits of desegregation the plan must be solidly designed. Thus, optimal desegregation should be the goal.

"(2) An unstable school system, in which frequent substantial changes are required in pupil and faculty assignment, school and grade organization, and construction programs, necessarily causes erosion of the educational program and is unmanageable administratively. The school system should be stabilized to the extent that the plans for organization of grades, facility construction, the placement of faculty, and assignment of students will not have to be again massively rearranged in the foreseeable future. A Plan should not depend upon artificial devices because such devices tend to produce instability.

14. Civil Rights Attorney Flannery absented himself from most of the conferences. He was represented by Attorney Howard, a younger man with little or no authority to speak. At one time the Court inquired of Mr. Howard as to whether he had indicated his accord with the long-range optimal plan. Mr. Howard did not respond and the Court did not press the point.

"(3) Although complete desegregation of pupils in every school is not feasible under the foregoing principles, nevertheless, the school system should seek to provide a desegregated educational experience at some level during each pupil's school career.

"(4) The success of an educational program depends in great measure upon teachers who are not only prepared educationally to teach the assigned subjects, but who are also qualified and suitable to perform under the circumstances in which they are placed. The assignment or reassignment of faculty to accomplish desegregation can be successfully accomplished only with teachers who have been adequately prepared. Programs should be conducted to provide adequate preparation of teachers.

"(5) Broad experimentation with the organization of the school system, which is not based on reliable evidence indicating successful results under circumstances prevailing in this City, should not be undertaken because of the potential destructive effect on the system.

"(6) The uncertainties, frustrations and delays attendant to the administration of a school system of more than 50,000 pupils under judicial supervision is erosive of that system. The responsibility for the control and operation of the Norfolk public schools should be clearly placed with the School Board, consonant with practical assurance of the constitutional exercise of that responsibility."

These principles adequately state the views of this Court; the same views that have consistently been upheld during the ten-year period since the first Negro child entered the previously all-white Norfolk public schools, although admittedly, by reason of broadened decisions and the apparent rejection of

the late Chief Judge John J. Parker's words in Briggs v. Elliott, 132 F.Supp. 776 (E.D.S.C., 1955—three-judge court), changes have been made. We do not believe that any court in this nation would now reject these principles as invoked by the School Board.

While not in agreement with the author of the opinion in United States v. Jefferson County Board of Education, supra, that the intent of Congress in enacting 42 U.S.C., sections 2000c(b) and 2000c–6, is limited to prohibiting the required assignment or transportation of students in de facto segregation areas, it is quite apparent that *Brewer* entertains that restricted view of the legislative intent. Assuming the correctness of this conclusion, it is not too readily ascertainable whether a particular residential pattern in a given area grew up as a result of de facto or de jure segregation, or perhaps both. Many courts are quick to accept the easier route by ordering mass transfers without regard to proper educational standards. As previously suggested, unless the Civil Rights Division is correct as to what constitutes de jure segregation with a spot of the disease poisoning the entire city or county, it appears that any intelligent approach will require endless days of testimony, research and exhibits. Herein lies the difficulty of removing from the school administration and transferring, for all practical purposes, to the courts, problems relating to assignment and transportation of school children, especially where an intelligent school administration has exhibited years of good faith cooperation with a willingness to make changes to comply with the many interpretations of the law by appellate courts.

Turning finally to the research studies giving rise to the proposed optimal plan of desegregation, we find several leading studies worthy of comment.[15]

15. Equality of Educational Opportunity, Dr. James S. Coleman (1966) (Coleman Report) ; Desegregation Research, Meyer Weinberg (1968) (Weinberg Report) ; Racial Isolation in the Public Schools, 2 volumes, United States Commission on

Civil Rights (1967) (Civil Rights Commission Report) ; Desegregation Works: A Primer for Parents and Teachers, Lillian S. Calhoun (1968) (Calhoun Report) ; Harvard Educational Review, Vol. 38 (1968) (Harvard Study, with referenc-

As Pettigrew says:[16]

"Put bluntly, children of all backgrounds tend to do better in schools with a predominant middle-class milieu; and this trend is especially true in the later grades where the full force of peer-group influence is felt."

If the foregoing statement is to be accepted, it lends support to the continuation of the neighborhood school in the elementary grades and the basic principle that, wherever possible, the majority of the children in attendance at a school should be the middle-class group. Pettigrew continues [17] by pointing out that Negroes in predominantly white classrooms score higher on the average, but those Negroes in classrooms with less than one-half whites do no better than those in all-Negro classrooms. However, as to white children, their achievement scores in biracial classes which are predominantly white average just as high as those of comparable children in all-white classes. The Coleman Report [18] points out that often those Negro pupils in classes with only a few whites score lower than those in totally segregated classes. The same author testified in Hobson v. Hansen,[19] 269 F.Supp. 401 (D.D.C., 1967), that the achievement of white students in predominantly white schools is higher than the achievement of white students in predominantly Negro schools, but the difference in their achievement is only about half as great as the case for Negro children in predominantly white schools.

Racial acceptance and interracial tension figure prominently in the success of desegregation. Negro students in desegregated classrooms who report no interracial acceptance achieve at a lower level than those, in the same or similar classrooms, who do report such acceptance; but white children who are accepted in predominantly Negro schools perform at lower levels than those who are not accepted. Just as acceptance in a predominantly white school aids Negro performance, acceptance of the white child in a predominantly Negro milieu has a depressing effect upon white performance.[20] Thus, where the majority of students have low achievement, others will be likely to follow suit.[21]

Cities such as Norfolk are confronted with the danger of white-flight. As suggested, the only realistic manner in which certain cities can achieve substantial successful integration is in conjunction with surrounding suburbs through metropolitan cooperation.[22] Norfolk, largely surrounded by water, can turn only to the adjacent City of Virginia Beach where the percentage of Negro population is probably not more than five percent. Any attempt to radically desegregate schools of Norfolk lying readily adjacent to Virginia Beach will lead to white-flight, a fact that is certainly not desirable from the standpoint of sound educational principles either in Norfolk or Virginia Beach. And, as the author suggests, the difficulties of achieving metropolitan cooperation on noncontroversial problems are nearly insurmountable, thereby making large-scale metropolitan integration at best problematical. There are just not enough suburban Negroes to desegregate schools outside the core of the central cities, and not enough affluent urban whites to desegregate schools within the hard-core central city.[23] Since Norfolk is one of the older cities, the problem is most difficult to resolve. One author states that, since the only possible plan

es to many authors including Harold Howe, II, Dr. James Coleman, Thomas Pettigrew, David K. Cohen, Henry Dyer, Kenneth Clark, Mario Fantini, Irwin Katz, Theodore R. Sizer, Daniel P. Moynihan, Samuel Bowles and others).

16. Harvard Study, p. 67.

17. Harvard Study, p. 71.

18. Coleman Report, p. 29.

19. Hobson v. Hansen, Tr. p. 2090.

20. Harvard Study, p. 130.

21. Civil Rights Commission Report, p. 89.

22. Harvard Study, p. 86.

23. Harvard Study, p. 133.

for achieving integregation in large cities is through metropolitan integration across present school district boundaries, it seems politically unfeasible.[24]

Much has been said with respect to school facilities. Many argue that unequal facilities lead to lower student achievement. This is not supported by the studies thus far conducted. As Moynihan says, "What small differences in school facilities did exist had little or no discernible relationship to the level of student achievement."[25] Equality in resources devoted to the education of children of different racial groups will not achieve equality of educational opportunity.[26]

Finally we turn to the teaching faculty. It is conceded that teachers are the most important element in the quality of education offered. The extent of their experience, the quality of their training, and their attitudes toward students all are important.[27] Former U. S. Commissioner of Education Harold Howe testified before the Kerner Commission that "many teachers are unprepared for teaching in schools serving disadvantaged children" and they "have what is a traumatic experience there and don't last." The defendant School Board has, for the past several years, conducted programs educating teachers of both races with respect to the problems confronting such teachers when assigned to schools where the majority of pupils and/or faculty are of a different race. The objective timetable required by *Brewer* is fully consistent with these principles.

The foregoing demonstrates a few of the problems confronting the School Board. These problems seem not to concern the Civil Rights Division and the NAACP. Apparently they do not disturb some courts, but they are of major concern to this court.

In the City of Norfolk, we are long past the days of integration. With few exceptions, children (and their parents) expect to encounter children of different races at some point during their public education. It seems to this court that the School Board is approaching the overall situation in a realistic manner, well supported by research studies which were, incidentally, substantially financed by the federal taxpayers. Acknowledging that there are adverse cumulative effects of total segregation, all of the problems cannot be resolved by a helter-skelter plan of assignment of students or faculty without regard to the basic principles of sound education now advanced by the Board's optimal desegregation plan.

Mandatory bussing to correct racial imbalance is not the answer. Indeed, there is no reputable authority suggesting that either bussing or correction of racial imbalance is required. Rather than balance the races, we are in need of some commonsense approach to balance the interests of the children involved who, according to the Civil Rights plan, would be mere pawns on the chess board.

The plan proposed by the Civil Rights Division, in which the NAACP concurs but insists upon even further bussing, has created much disturbance and concern among the school children and their parents, both white and black. They want no part of the extensive bussing as now advocated. While admittedly these persons have little grasp upon the legal complexities presented, they have a feeling that, since the Government (acting through the Civil Rights Division) is advocating this radical and hastily conceived plan, the Government always prevails. They do not realize that the Government is only another party litigant, entitled to its day in court but subject to the same criticism as any other party. It is unfortunate, however, that a more responsible representation cannot present the views of all citizens of all races, consistent with the law, but with

24. Harvard Study, p. 165.

25. Harvard Study, p. 24.

26. Harvard Study, p. 90.

27. Civil Rights Commission Report, p. 93.

**32**

a paramount objective of sound education.

Every cloud has a silver lining. The aftermath of the Civil Rights plan may tend to soften the blow when the School Board presents its optimal plan of desegregation. That long-range plan will undoubtedly bring forth much adverse comment, but the public will at least know that the Government demanded even more. This adequately emphasizes the need for an educational program among all citizens prior to placing in operation any long-range optimal plan of desegregation and, standing alone, would justify what has been heretofore ordered.

Counsel may request additional findings following the completion of the transcript.