**David JOHNSON et al., Plaintiffs,**

v.

**SAN FRANCISCO UNIFIED SCHOOL DISTRICT et al., Defendants.**

**No. C–70 1331.**

United States District Court,
N. D. California.

July 9, 1971.

Arthur Brunwasser, James Herndon, Garry, Dreyfus, McTernan & Brotsky, San Francisco, Cal., for plaintiffs.

Thomas M. O'Connor, City Atty., George E. Krueger, Deputy City Atty., Irving G. Breyer, Legal Advisor, San Francisco Unified School Dist., San Francisco, Cal., for defendants.

Willis Hannawalt, Vivian Hannawalt, San Francisco, Cal., for intervenors.

## MEMORANDUM OF DECISION, JUDGMENT AND DECREE

WEIGEL, District Judge.

### Governing Legal Principles

More than seventeen years ago, a unanimous decision of the United States Supreme Court made it clear that racial discrimination in public education violates the Constitution of the United States. Today it is established beyond all question that any law, ordinance or regulation of any governmental agency (whether federal, state, county or city) requiring or furthering such discrimination violates the Constitution of the United States. The cases so holding are legion. They have been handed down, not only by the Supreme Court of the United States, but, as well, by other courts located throughout the nation. A representative handful is set out in the margin.[1]

---

1. Brown v. Board of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Brown v. Board of Educ., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); Hall v. St. Helena Parish School Bd., 197 F.Supp. 649 (E.D.La.1961), aff'd, 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521 (1962); Goss v. Board of Educ., 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963); Griffin v. County School Bd., 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Lee v. Macon County Bd. of Educ., 267 F.Supp. 458 (M.D.Ala.), aff'd, Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967); Green v. County School Bd., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Poindexter v. Louisiana Financial Assistance Comm'n, 275 F.Supp. 833 (E.D.La.1967), aff'd, 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968); Swann v. Charlotte-Mecklenburg Bd. of Educ.,

Therefore, those citizens or groups—the record indicates that there are some—who would promote or require racial discrimination in public education cannot have their way through court action. They must either bring about an amendment to the Constitution of the United States or undertake to violate it.

■ The law is settled that school authorities violate the constitutional rights of children by establishing school attendance boundary lines knowing that the result is to continue or increase substantial racial imbalance.[2] The law is settled that school authorities violate the Constitution by providing for the construction of new schools or enlargement of existing ones in a manner which continues or increases substantial racial imbalance.[3] The law is settled that school authorities violate the Constitution by assigning black teachers and teachers of limited experience to "black" schools while assigning few, if any, such teachers to "white" schools.[4]

■ The evidence in this case makes it unquestionably clear that, as to the San Francisco elementary schools, the San Francisco school authorities have done all of these things persistently and over a period of years.[5]

■ It has been urged that the decisions forbid such practices only in those states (nearly all in the South) which, at an earlier time, had dual school systems. These contentions may possibly have some peripheral historical and geographical validity; they have no validity whatever in law or equity. It is shocking, indeed, it is nonsensical, to assume that such practices are forbidden to school authorities in Florida or North Carolina, for example, but are permitted to school authorities in California. Neither the United States Supreme Court nor any other court has drawn a Mason-Dixon Line for constitutional enforcement. None has set up any such double standard of legality in constitutional interpretation.

■ Misconceptions of this kind may underlie contentions that the action of the San Francisco school authorities has not been *de jure* in character. It is now well settled law that any rule or regulation by school authorities which creates or continues or heightens racial segregation of school children is *de jure*. In legal terms, *"de facto"* is often used as an opposite of *de jure*. It is not difficult to illustrate the difference between the two. If a school board has drawn attendance lines so that there is a reasonable racial balance among the children attending a given school and if, thereafter, solely due to movement of the neighborhood population, the school attendance becomes racially imbalanced, the segregation thus arising is then *de facto*. On the other hand, if the school board, as in this case, has drawn school attendance lines, year after year, knowing that the lines maintain or heighten racial imbalance, the resulting segregation is *de jure*.[6]

402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Clemons v. Board of Educ., 228 F.2d 853 (6th Cir. 1956); Taylor v. Board of Educ., 294 F.2d 36 (2d Cir.), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961); Hobson v. Hansen, 269 F.Supp. 401 (D.D.C.1967), appeal dismissed, 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1968); United States v. School District 151, 286 F.Supp. 786 (N.D.Ill.), aff'd, 404 F.2d 1125 (7th Cir. 1968); Brewer v. School Bd. of City of Norfolk, 397 F.2d 37 (4th Cir. 1968); Coppedge v. Franklin County Bd. of Educ., 273 F.Supp. 289 (E.D.N.C.1967), aff'd, 394 F.2d 410 (4th Cir. 1968); United States v. Board of Educ., 396 F.2d 44 (5th Cir. 1968); Board of Educ., etc. v. Dowell, 375 F.2d 158 (10th Cir.), cert. denied, 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (1967); Davis v. School District, 309 F.Supp. 734 (E.D.Mich. 1970), aff'd, 443 F.2d 573 (6th Cir. 1971); Spangler v. Pasadena City Bd. of Educ., 311 F.Supp. 501 (C.D.Cal. 1970); Jackson v. Pasadena City School Dist., 59 Cal.2d 876, 31 Cal.Rptr. 606, 382 P.2d 878 (1963).

2. See Appendix B, at 1329.

3. *Id.*, at 1341.

4. *Id.*, at 1339.

5. *See id.*

6. *See id.*

No evidence whatever has been brought before the Court to show that, throughout the years since 1954 (when the United States Supreme Court held that racial segregation of children was an unconstitutional denial of equal educational opportunity), the San Francisco school authorities had ever changed any school attendance line for the purpose of reducing or eliminating racial imbalance.[7]

There is perhaps one more thing to be said regarding the term *de jure*. It need not be one stigmatizing school authorities. It does not imply criminal or evil intent. In the context of segregation, it means no more nor less than that the school authorities have exercised powers given them by law in a manner which creates or continues or increases substantial racial imbalance in the schools. It is this governmental action, regardless of the motivation for it, which violates the Fourteenth Amendment.[8]

### Some Practical Considerations

It has been urged upon the Court that desegregation of the San Francisco elementary schools should be delayed to a time later than the commencement, on September 8, 1971, of the next full term of the San Francisco elementary schools. Even if delay were legally permissible, it would be undesirable. And it is not legally permissible. Where, as here, the constitutional rights of children to equality of educational opportunity are being denied, the law requires the promptest possible correction, overriding considerations of expediency such as cost and inconvenience. Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed. 2d 19 (1969); Carter v. West Feliciana Parish School Board, 396 U.S. 226, 90

S.Ct. 467, 24 L.Ed.2d 382 (1969); Keyes v. School District No. 1, 396 U.S. 1215, 90 S.Ct. 12, 24 L.Ed.2d 37 (Brennan, J.) (vacating stay). At the open-court hearings held concerning the respective plans submitted by plaintiffs and defendants, relevant testimony was given by experts employed by defendants. They declared, without qualification or contradiction by anyone, that it is feasible to put either plan into operation at the start of the school term this fall. Over-all, the delay in integrating the San Francisco elementary schools has gone on far too long. It has gone on throughout the seventeen years following the Supreme Court's proscription of segregated schools, notwithstanding the fact that the San Francisco school authorities had for many years known of the segregation, such knowledge having come, not only from citizen groups, but from one or more studies ordered and paid for by the San Francisco Unified School District itself.[9]

It has been repeatedly urged upon the Court that, since the racial population of San Francisco (and of its elementary school children) is more diverse than in other communities, racial segregation in the elementary schools ought to be permitted. The law allows no such latitude. And the facts make it ill-advised.

While plaintiffs complain only of segregation of black students, the plan they have filed, as well as that filed by defendants, provides for a balancing of all races. The fact that the Court did not require more than desegregation of black students does not make the plans invalid. And there are solid reasons supporting the parties in their plans for desegregation of all races.

---

7. *See id.*

8. In the end, the whole *de facto* versus *de jure* debate may turn out to be insignificant. While the Supreme Court has not yet acted in cases of *de facto* segregation, there is compelling authority in decisions of lower courts requiring its elimination. *See* Barksdale v. Springfield School

Comm., 237 F.Supp. 543 (D.Mass.1965); Offermann v. Nitkowski, 248 F.Supp. 129 (W.D.N.Y.1965), aff'd, 378 F.2d 22 (2d Cir. 1967); Jackson v. Pasadena City School Dist., 59 Cal.2d 876, 31 Cal.Rptr. 606, 382 P.2d 878 (1963).

9. *See* Appendix B.

The multiplicity of racial backgrounds makes effective desegregation more, not less, important. All who testified on the subject were unanimous in pointing out that the evils of racism and ethnic intolerance are not limited to blacks and whites. Those who oppose desegregation, however well intentioned, would deprive children of the most meaningful opportunities to know members of different races. Opposition to desegregation fosters false concepts of racial superiority and of racial inferiority. And opposition to desegregation in the elementary schools is particularly ill-advised. It works to prevent the kind of exchange in formative years which can best inoculate against racial hatred. Racial hatred is an adult rather than a childhood disease.

The law and the facts, then, in this case are at one in calling for desegregation of the San Francisco elementary schools.

 The evidence demonstrates that there simply cannot be desegregation without some busing of some students because there are districts in the city in which there are great preponderances of members of one particular race. The evidence also dispels false rumors and other fallacies regarding busing. For example, the National Safety Council statistics, put in evidence, demonstrate that busing is by far the safest means of getting children to and from school. And whatever the real or asserted concerns of parents, the evidence is without dispute in showing that children enjoy busing.

The evidence further shows that the problem of getting parent and child together in emergency situations is not aggravated by busing. One reason is that many school authorities provide for one or more vehicles serving each school zone to be equipped with radios and to operate on a standby or cruising basis for such emergencies. The San Fran-

cisco school authorities, as stated in testimony on their behalf, will make such arrangements.

It should be noted, too, that the Supreme Court itself, speaking through Chief Justice Burger, recently pointed out (in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 29, 91 S.Ct. 1267, 1282, 28 L.Ed.2d 554 (1971)):

"* * * Bus transportation has been an integral part of the public education system for years, and was perhaps the single most important factor in the transition from the one-room schoolhouse to the consolidated school. *Eighteen million of the nation's public school children, approximately 39% were transported to their schools by bus in 1969–1970 in all parts of the country.*" (Emphasis added.)

This is not to say that busing is a desirable end in itself. It is not. However, the law requires an elimination of the segregation in the San Francisco elementary schools which has so long persisted and has resulted in the fact that while only 28% of the total student population is black, 80% of the black children have been concentrated (by district attendance regulations) in 27 schools in which the black students constitute from 47% to 96% of the total student bodies. In 21 of those schools, the student bodies are over 71% black. Excessive racial imbalances such as this cannot be eliminated without transporting some school children. In any case, no useful purpose is served by the attempts of some to magnify the relatively small amount of busing which will be required in San Francisco.[10]

Finally in this connection, it should be noted that all of the hue and cry about busing, shown and reflected in the evidence, defeats salient purposes of many of those opposed to busing who say they fear a "white" flight from San Fran-

---

10. In *Swann*, busing was ordered for a school district of 550 square miles. San Francisco is less than 50 miles square. The relative time and distance of busing is miniscule by comparison.

cisco. By feeding unwarranted fears about busing, those opposing desegregation invite a white flight even before children and parents have had a reasonable opportunity to see for themselves how busing works in actual practice. The testimony in this case makes it clear that in those communities in which busing has been employed, it has worked well. There was no evidence to the contrary.

### Chronology of This Case

To provide a convenient chronology of this proceeding and ready reference to prior orders of the Court, the following may be noted.

1. Plaintiffs' suit was filed on June 24, 1969.

2. On August 25, 1970, after the submission of extensive written and oral testimony, all parties (including intervenors) submitted the case for the final decision.

3. The prior orders of this Court relating to the merits of the case were the following:

A. Order Setting Aside Submission, dated September 22, 1970.

B. Memorandum And Order Requiring The Parties To File Plans For School Desegregation, dated April 28, 1971, copy attached hereto as Appendix A.

C. Supplementary Findings Of Fact And Conclusions of Law, dated June 2, 1971. Copy attached hereto as Appendix B

D. Order Re Hearing On Plans, dated June 22, 1971.

### Concerning the Final Judgment and Decree

 It will be noted that the Court's Judgment and Decree, in effect, approves both the Horseshoe Plan submitted by the defendants and the Freedom Plan submitted by the plaintiffs. It is left to the choice of the school authorities to implement either one. Since the school authorities themselves submitted Horseshoe, it is anticipated that they will elect to carry out that plan. Even so, there is utility in the approval of the Freedom Plan. If the school authorities find that, after sufficient actual operating experience, the zones established under Horseshoe do not sufficiently eradicate racial imbalance or are excessively vulnerable to creation of serious imbalance by demographic change, they can turn to the ready-made Freedom Plan with its provision for zones more closely in line with the racial balance of the total elementary school population.

There are a number of reasons why the Court has not limited its approval to the Freedom Plan alone even though it does provide for closer racial balance.

While evidence of community sentiment or public feelings, however accurate, cannot be the measure of compliance with the law, if both plans do qualify under the law—and both do— it is hardly ill-advised to permit implementation of that which the competent school authorities themselves have brought forward after extensive public hearings.

 The full educational benefits of desegregation will not be had by the mere meeting of arithmetical percentages on racial balance. If desegregation is to provide maximum benefit, it is essential to have the good willed, open minded and genuine cooperation of school administrators, teachers, other school personnel, parents and the community at large. Therefore, while the Court cannot relax legal requirements in the interest of satisfying an actual or assumed preponderance of community opinion, it may appropriately give reasonable weight to such a factor in considering two very different plans, both of which satisfy the legal requirements.

 Modifications of Horseshoe, filed with the Court since the original plan was submitted on June 10, 1971, show a significant improvement in providing for racial balance. In transmitting the most recent modification, counsel for defendants assure the Court "that any deviation from the 15% State guide-

lines would now occur—if at all—in no more than four or five schools and be something less than 2 percentage points" and "that the San Francisco Unified School District regards 'Horseshoe' as an evolving plan, and remodeling will continue through the summer with a view toward obtaining even further improvement in racial percentages." [11] Manifestly, remodeling and other changes can be made from time to time in the future in the interest of improving Horseshoe in respect to racial balance as well as in other respects.

Horseshoe does call for less busing than the plan submitted by the plaintiffs. While, as noted earlier, busing is not, *per se*, a bad thing, neither is it desirable as an end in itself. Moreover, Horseshoe is the more complete and detailed plan. This is not stated as a criticism of Freedom. Much of the information utilized in Horseshoe was not available to plaintiffs. And Freedom is a good plan.

At this point, a delineation of some of the effects of today's Judgment and Decree will be helpful to all concerned in avoiding misunderstanding.

1. It favors no race nor ethnic group. It has been fashioned so that benefits and burdens are shared equally by all.

2. Nothing whatever in it de-emphasizes quality education. The plans approved actually provide for better education.

3. The Judgment and Decree does not require gifted children to be held back. They may be given special preferences or attention or handling in any manner which does not involve or promote racial segregation.

4. Bi-lingual classes are not proscribed. They may be provided in any manner which does not create, maintain or foster segregation.

5. There is no prohibition of courses teaching the cultural background and heritages of various racial and ethnic groups. While such courses may have particular appeal to members of the particular racial or ethnic group whose background and heritage is being studied, it would seem to be highly desirable that this understanding be shared with those of other racial and ethnic backgrounds.

6. The Decree does not preclude innovation nor experimentation nor creativity in educational practices. Indeed, the intent is to give school authorities maximum scope so long as they do not act to create, maintain or increase segregation or delay desegregation. Thus, while the law does not require socio-economic balance in the student bodies of each school, the Decree does not prevent school authorities from working to that end. Nor does it prevent their working to attempt to balance student bodies upon the basis of performance on standardized tests. Nor does it interfere with the Richmond Complex or the projected Park South Complex, both of which the Court hereby expressly approves, subject only to those minimal changes, if any, necessary to comply with the Decree. Nor does it preclude experimental schools under the supervision of special management arranged by contract. The foregoing and other educational practices working toward improvement in the quality of education are consistent with the Judgment and Decree so long as, to repeat, they neither create, maintain nor increase segregation nor delay desegregation.

7. The Judgment and Decree does command the school authorities carefully to provide for the physical safety and security of all students during their school attendance and bus transportation. It also requires that all parents be fully advised in advance about these matters.

8. The Judgment and Decree contemplates that desegregation will be carried out solely by the school authorities themselves. If they and all

11. Letter of transmittal dated July 2, 1971.

concerned act in good faith by complying with the law requiring desegregation, there will be no need for any further court action whatever.

The Judgment and Decree now to be entered is of less consequence than the spirit of community response. In the end, that response may well be decisive in determining whether San Francisco is to be divided into hostile racial camps, breeding greater violence in the streets, or is to become a more unified city demonstrating its historic capacity for diversity without disunity.

The school children of San Francisco can be counted upon to lead the way to unity. In this and in their capacity to accept change without anger, they deserve no less than the whole-hearted support of all their elders.

## FINAL JUDGMENT AND DECREE

Plaintiffs, parents of black children attending public elementary schools in the San Francisco Unified School District, having, on June 24, 1969, filed a complaint seeking desegregation of those schools; defendants, the San Francisco Unified School District, the individual members of the Board of Education thereof, and the Superintendent of said District, having appeared and denied the substantive allegations of said complaint; twelve parents having been permitted to intervene on behalf of their respective Chinese, Japanese, Spanish surname, black and white children and having appeared in opposition to plaintiffs; oral testimony offered by the original parties, as well as by intervenors, having been heard; voluminous documents having been introduced in evidence; all parties, including intervenors, having stipulated, on August 25, 1970, that the case was then submitted for final judgment and decree; plaintiffs and defendants having on June 10, 1971, complied with a prior order by filing separate plans for desegregation of the elementary schools; special hearings having been held on June 24 and 25, 1971 on those plans; and the Court being fully advised and having carefully considered the matter, it is hereby

Ordered, adjudged and decreed as follows:

### I.

A. The preliminary Findings of Fact and Conclusions of Law, contained in the "Memorandum and Order Requiring the Parties to File Plans for School Desegregation", filed April 28, 1971 (copy attached hereto as Appendix "A"), are hereby confirmed and incorporated herein by reference.

B. The "Supplementary Findings of Fact and Conclusions of Law", June 2, 1971 (copy attached hereto as Appendix "B"), are hereby confirmed and incorporated herein by reference.

C. The additional facts stated in the foregoing Memorandum of Decision are hereby found by the Court.

D. For a long period of time there has been and there now is *de jure* segregation in the San Francisco public elementary schools.

E. This segregation must be eradicated forthwith.

F. Subject to the further provisions of this Judgment and Decree, the Court hereby approves the Horseshoe Plan submitted by defendants.

G. Subject to the further provisions of this Judgment and Decree, the Court hereby approves the Freedom Plan submitted by plaintiffs.

### II.

Unless the context requires otherwise, the following words have the following respective meanings as used in this Judgment and Decree:

A. "District" means the San Francisco Unified School District, the Board of Education thereof, their respective and joint officers, agents and employees, including the Superintendent of said District.

B. "Schools" means the public elementary schools of the District.

C. "Certificated personnel" means teachers and administrators.

D. "Classified personnel" means clerical, technical, unskilled, and other similar employees.

E. "Segregation" means, in reference to any group or class of persons, that the ratio of whites to blacks in that group or class is substantially at variance with the ratio of white children to black children in the total student population of the schools.

### III.

This Judgment and Decree is binding upon the District, its agents, officers, employees, and their successors, as well as upon all other persons who now or hereafter receive notice of this Judgment and Decree. No person shall directly or indirectly violate or attempt to violate or cause violation of any of its provisions.

### IV.

The District is directed and ordered:

A. To carry out, effective at the start of the next term of the schools on September 8, 1971, desegregation of the student bodies of each and all of the schools as provided for by the Horseshoe Plan or by the Freedom Plan.

B. To carry out, diligently and promptly, all other provisions of the Horseshoe Plan or the Freedom Plan provided, however, that if any provision is in conflict with any provision of this Final Judgment and Decree, the latter shall control.

C. To make bona fide, continuing and reasonable efforts, during the next five years, to eliminate segregation in each and every school.

D. To establish and carry out, diligently and promptly, practices for the hiring of certificated and classified personnel which will effectively eliminate segregation in the respective staffs, over-all, and in each school.

E. To establish and carry out, diligently and promptly, practices for the assignment of certificated and classified personnel in a manner which will effectively eliminate segregation in the respective staffs, over-all, and in each school.

F. To establish and carry out, diligently and promptly, practices for the assignment of certificated and classified personnel which will effectively promote equalization of competence in all schools.

G. To exercise, at all times, the highest degree of care for the safety and security of all school children at all times during their school attendance and transportation.

H. To provide, to the fullest extent feasible, racial and ethnic balance among students to be bused.

I. To inform all parents in writing, as soon as reasonably possible before the start of the school term this fall (1) of their children's school assignments and (2) of the details regarding bus transportation including, but not limited to, an outline of the safety measures which the District will utilize and of the procedures for enabling parents promptly to reach children in case of emergency.

J. To file with the Court within sixty (60) days after the end of each school year, until the Court may otherwise order, a report showing in reasonable detail all actions taken to comply with this Judgment and Decree.

### V.

The District is permanently restrained and enjoined from:

A. Continuing, establishing or furthering segregation in the schools as to pupils, certificated personnel or classified personnel, any or all.

B. Authorizing, carrying out or permitting school construction programs which will create, maintain or increase segregation, whether by enlargement of existing facilities or by location of new ones or otherwise.

C. Authorizing, carrying out or permitting hiring practices which will create, maintain or increase segregation among certificated or classified personnel, either or both.

D. Assigning *certificated or classified* personnel, either or both, in any way which will create, maintain or increase segregation.

E. Authorizing, permitting or using tracking systems or other educational techniques or innovations without effective *provisions to avoid segregation.*

F. Discriminating against any race or ethnic group in provisions for transportation of children.

G. Using testing devices, such as the National Teachers Examination or other methods of selection of personnel for employment, likely to result in the exclusion of qualified applicants because of race or ethnic background.

## VI.

The Court does not now, but may hereafter, at any time, and from time to time, establish a panel or board to hear and resolve (subject to final approval by the Court) any dispute which may arise in connection with the carrying out of this Final Judgment and Decree or the Court may provide for the referring of any such dispute for preliminary hearing before a master or federal magistrate or the Court may require other reasonable procedures in the interest of prompt, fair and effective resolution of any such dispute.

## VII.

Plaintiffs' costs shall be taxed to defendant District. The Court expressly reserves the power to determine, at a later date, whether or not the District shall reimburse plaintiffs for their reasonable attorney's fees and for reasonable fees and expenses incurred in obtaining experts to assist in the preparation of the plaintiffs' desegregation plan.

## VIII.

The Court expressly retains complete and continuing jurisdiction to modify this final Judgment and Decree on its own motion or on the motion of any party. No person shall subvert any of its provisions by indirection or otherwise.

## IX.

This Final Judgment and Decree is effective immediately. Testimony having established that timely compliance is feasible, and the Court having carefully considered the respective rights of all parties and the interests of all affected, a stay of this Final Judgment and Decree shall not be available from this Court.

## APPENDIX A

## MEMORANDUM AND ORDER REQUIRING THE PARTIES TO FILE PLANS FOR SCHOOL DESEGREGATION

Seven months ago, on September 22, 1970, this Court decided that justice in this case would best be served by postponing definitive action until after the Supreme Court of the United States decided six cases then pending before it. Last week, the six decisions were handed down.[1] Each decision was unanimous.

While the six decisions did relate to Southern states in which there had at one time been "racially separate public schools established and maintained by state action" [Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 5, 91 S.Ct. 1267, 1271, 28 L.Ed.2d 554 (1971)], neither the logic nor the force of the rulings is limited by any North-South boundary line.

1. Swann v. Charlotte-Mecklenburg Bd. of Educ., (1971); Charlotte-Mecklenburg Bd. of Educ. v. Swann, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Davis v. Board of School Commissioners, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); North Carolina State Bd. of Educ. v. Swann, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971); McDaniel v. Barresi, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971); Moore v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 47, 91 S.Ct. 1292, 28 L.Ed.2d 590 (1971).

For the past seventeen years, every Supreme Court decision on the subject has consistently struck down racial segregation in public schools resulting from laws which either directly or indirectly required or contributed to such segregation.[2] Last week's decisions fortify—do not water down—the prior holdings. And the Supreme Court has never condoned any double standard of constitutional compliance based upon geography.

While it was not clear seven months ago, it is clear today that to correct unlawful racial segregation in public schools:

1. Busing can be required and state law may not prohibit it.

2. Racial balance or quotas may be judicially imposed.

3. Some students may be permitted to attend schools near their homes; others may be required to attend distant schools.

4. Any student may be required to attend a particular school because of his race.

5. United States District Courts have exceptionally broad equity powers to shape decrees to meet the complex problems of protecting the constitutional right to equality of educational opportunity.

It is now clear, too, under last week's Supreme Court decisions, that the San Francisco Board of Education possesses powers broad enough to correct the unlawful segregation which still persists in the San Francisco elementary schools.[3]

2. *See, e. g.*, Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) and Raney v. Board of Education, 391 U.S. 443, 88 S Ct. 1697, 20 L.Ed.2d 727 (1968) (holding "freedom of choice" plans unconstitutional); Griffin v. County School Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964) (holding unconstitutional the closing of all the schools in one county); Goss v. Board of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963) (holding unconstitutional a free transfer provision by which students were allowed to transfer, solely on a racial basis, from the school to which they had been assigned by virtue of redistricting if they were in a racial minority in their new school).

3. FINDINGS OF FACT AND CONCLUSIONS OF LAW. The Court, having considered the voluminous evidence presented by the parties, hereby finds:

1. That public elementary schools in the San Francisco Unified School District are racially segregated.

2. That while only 28.7% of all the children enrolled in the elementary schools are black, 80% of the black children are concentrated in twenty-seven schools out of a total of more than one hundred. The student bodies of these 27 schools range from 47.3% black to 96.8% black. In only two of them are black children even slightly in the minority and in only four are the student bodies less than 72% black. (Plaintiffs' Exhibits 1 and 2.)

3. That acts and omissions of the San Francisco Board of Education are proximate causes of the racial segregation.

4. That such acts include:

a. Construction of new schools and additions to old schools in a manner which perpetuated and exacerbated existing racial imbalance. (Exhibit "B", Plaintiffs' Reply Brief in Support of Motion for Preliminary Injunction, July 27, 1970; Deposition of William L. Cobb, Ph.D., of July 14, 1970, pages 78–80; Deposition of Laurel E. Glass, Ph.D., of July 20, 1970, pages 22–59).

b. Drawing attendance zones so that racial mixture has been minimized; modification and adjustment of attendance zones so that racial separation is maintained. (Deposition of Laurel E. Glass, Ph.D., *supra*, pages 19–28; Deposition of William L. Cobb, Ph.D., *supra*, pages 51–57; Plaintiffs' Exhibits 1–8).

c. Allocating a highly disproportionate number of inexperienced and less qualified teachers to schools with student bodies composed predominantly of black children. (Deposition of Laurel E. Glass, Ph.D., *supra*, pages 48–50; Affidavit of Maureen O'Sullivan, July 17, 1970).

And, of course, to repeat for emphasis, it is now clear that the Court has both the power and the duty to do so if the school authorities fail or refuse.

This situation was anticipated by this Court some seven months ago when it stated:

This decision to postpone judgment should not be misinterpreted. Defendants should prepare themselves to be ready promptly to meet whatever requirements may be delineated by the Supreme Court of the United States. Once the Supreme Court has laid down the law, no person or agency bound by that law, nor any court, can be permitted delay in conforming to the legal requirements.

It would appear, therefore, that defendants would do well promptly to develop plans calculated to meet the different contingencies which can reasonably be forecast. If, for example, the Board of Education works out details for maximum changes based upon the assumption that the Supreme Court will require them, the Board will then be able to act effectively, in case of need, without causing confusion and with a minimum of unnecessary dislocation. Should the decisions of the Supreme Court not require such substantial changes, the Board and those connected with it will at least have made what ought to be productive studies of various means for promoting equality of educational opportunity.

In the light of all of the foregoing, the Court hereby orders defendants to file, on or before June 10, 1971, a comprehensive plan for the desegregation of all San Francisco public elementary schools to go into effect at the start of the school term in the fall of this year. The Court hereby also orders the plaintiffs to

---

5. That such omissions include:

a. Failure to accept suggestions offered by school officials regarding the placement of new schools so as to minimize segregation. (Deposition of William L. Cobb, Ph.D., *supra*, pages 78–96).

b. Failure to adopt a policy of consulting with the Director of Human Relations of the School District as to the predictable racial composition of new schools. (Deposition of William L. Cobb, Ph.D., *supra*, page 76).

c. Prolonged failure to pursue a policy of hiring teachers and administrators of minority races. (Plaintiffs' Exhibit 14).

d. Failure to take steps to bring the racial balances in elementary schools within the guidelines set by the State Board of Education. (Plaintiffs' Exhibit 1; Plaintiffs' Exhibit 21–B, page 25; Deposition of William L. Cobb, Ph.D., *supra*, pages 67–106).

e. Failure to adopt sufficient measures to improve the education of children in predominantly black schools despite the Board's knowledge that education in these schools was inferior to that provided in predominantly white schools. (Deposition of Isadore Pivnick, of July 14, 1970, pages 14–19; Deposition of Laurel E. Glass, Ph.D., *supra*, page 16; Affidavit of Maureen O'Sullivan, July 17, 1970).

f. Failure to respond to recommendations regarding integration made at the Board's request by the Stanford Research Institute and by the Report of the Citizens' Advisory Committee to the Superintendent's Task Force Studying Educational Equality/Quality and Other Proposals. (Plaintiffs' Exhibits 26 and 32).

Having found these facts, the Court concludes that segregation which exists in San Francisco's public elementary schools results from state action and is unconstitutional under Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), as well as under later decisions of the Supreme Court of the United States. Because time is of the essence in vindicating the right of elementary school children in San Francisco to equal educational opportunity, the Court now enters only preliminary findings and conclusions in support of the order today made. The citations to the record by no means exhaust the substantiating evidence before the Court. More extensive findings of fact and conclusions of law will be filed as occasion may arise.

file such a plan on or before that date for the assistance of the Court in the event the Court should find defendants' plan inadequate or otherwise deficient.[4]

If defendants have paid heed to the strong suggestion of this Court, in its order of September 22, 1970, they will have had, by June 10, 1971, almost nine months for development of their plan. Since the time for plaintiffs' is less than two months, the Court suggests that plaintiffs at once undertake to enlist the assistance of one or more highly qualified experts to develop their plan.

For the general guidance of both plaintiffs and defendants, the Court directs the parties to perfect their plans not only in the light of all relevant decisions of the United States Supreme Court but particularly in the light of the remedies approved in *Swann, supra,* and its companion cases. The Court also deems it appropriate to suggest that each plan should be carefully prepared in detail to insure accomplishment of at least the following objectives by the start of the 1971 fall school term.

　1.　Full integration of all public elementary schools so that the ratio of black children to white children will then be and thereafter continue to be substantially the same in each school. To accomplish this objective, the plans may include provision for:

　　a.　Use of non-discriminatory busing if, as appears now to be clear, at least some busing will be necessary for compliance with the law.

　　b.　Changing attendance zones whenever and wherever necessary to eliminate or head off racial segregation.

　2.　Assurance that school construction programs will not promote racial segregation whether by enlargement of existing facilities or location of new ones or otherwise.

　3.　Establishment of practices for the hiring of teachers and administrators which will effectively promote racial balance in the respective staffs.

　4.　Establishment of practices for the assignment of teachers and administrators which will effectively promote racial balance of the respective staffs in each school.

　5.　Establishment of practices for the assignment of teachers and administrators which will effectively promote equalization of competence in teaching and administration at all schools.

　6.　Avoidance of use of tracking systems or other educational techniques or innovations without provision for safeguards against racial segregation as a consequence.

The foregoing delineation is not intended to limit the scope of the plans to be filed nor to hamper creativity by those who prepare them nor to specify details better spelled out by qualified experts in education. The intent, rather, is to indicate requirements which, in the light of the facts before the Court, are necessary for compliance with the law.

That is the thrust of all of this—the law must be obeyed. The Court fully understands that public opinion is divided on many questions relating to desegregation of our schools. But disagreement with the law is no justification for violation. And, where as here, segregation in our schools has been fostered by action and inaction over a long period of years, the law requires corrective measures.

The Court fully understands, too, the many complicated, difficult and serious problems which must be solved. They

4.　The Court itself will not hesitate to appoint one or more consultants to assist it should that later become necessary or advisable. Regarding the Court's power to do so, *see* Swann v. Charlotte–Mecklenburg Bd. of Educ., 431 F.2d 138 at 148 (4th Cir. 1970).

run the gamut from those of finance and geography and personnel on through to the emotional. But the difficulties are far from insurmountable. A genuine will to meet and overcome them is the first requisite.[5]

The stakes are surely high enough to generate that will. Respect for law in the education of the elementary school children of the city of today can do much to reduce crime on the streets of the city of tomorrow.

In any case, the Court, as heretofore, retains jurisdiction to take such further action at any time as it may deem necessary to provide for compliance with the Constitution and laws of the United States.

Dated: April 28, 1971.

## APPENDIX B

## SUPPLEMENTARY FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. PRELIMINARY

The Findings and Conclusions set out in the "Memorandum and Order Requiring the Parties to File Plans for School Desegregation" dated April 28, 1971, are hereby incorporated herein by reference and the Findings and Conclusions herein are hereby, *nunc pro tunc*, incorporated therein. Provision was made in said Memorandum and Order for supplemental Findings and Conclusions and, on May 28, 1971, plaintiffs and defendants stipulated in open court for the filing of such additional Findings and Conclusions.

### II. DEFINITIONS

Unless the context requires otherwise, the following words have the following respective meanings as used in the Findings of Fact and Conclusions of Law herein. "District" means the San Francisco Unified School District, the Board of Education thereof, all officers and agents of said District and/or said Board including the Superintendent of said District. "Schools" means the elementary schools of the District.

### III. FINDINGS OF FACT

1. The schools are racially segregated. Over one-half (54 of the total of 102) of the schools have racial compositions which make each of them black or non-black in that the racial composition of the student body of each varies so excessively from the racial composition of the District's total school population. Eighty per cent of the District's black children are concentrated (by District attendance regulations) in twenty-seven schools in which the respective student bodies range from 47.3% black to 96.8% black. The District's total school population is only 28.7% black. In only two of these twenty-seven schools are black children even slightly in the minority and in only four others are the student bodies less than 71% black. Segregation in the schools is also shown by consideration of twenty-seven schools which, under attendance rules laid down by the District, have so few black children as to be identifiably non-black schools. In these twenty-seven schools, the percentage of black students ranges from a maximum of 6.9% to the irre-

---

5. " * * * The problem of changing a people's mores, particularly those with an emotional overlay, is not to be taken lightly. It is a problem which will require the utmost patience, understanding, generosity and forbearance from all of us, of whatever race. But the magnitude of the problem may not nullify the principle.

And that principle is that we are, all of us, freeborn Americans, with a right to make our way, unfettered by sanctions imposed by man because of the work of God." J. Skelly Wright speaking in Bush v. Orleans Parish School Board, 138 F. Supp. 337 at 342 (E.D.La.1956).

ducible minimum of 0.0%. The chart below shows the striking degree of racial imbalance evidenced in the fifty-four schools:

| Column A | | % Black Students | Column B | % Black Students |
|---|---|---|---|---|
| 1. | Hunters Point II | 96.8% | Cleveland | 6.9% |
| 2. | Golden Gate | 96.1% | Alamo | 6.7% |
| 3. | Jedediah Smith | 95.9% | Glen Park | 6.3% |
| 4. | Sir Francis Drake | 95.8% | Fairmount | 6.1% |
| 5. | Annex Jedediah Smith | 93.7% | Lakeshore | 6.0% |
| 6. | Sheridan | 92.3% | Excelsior | 5.9% |
| 7. | Burnett | 92.2% | Kate Kennedy | 5.7% |
| 8. | Ortega | 91.7% | Sutro | 5.3% |
| 9. | Bret Harte | 91.2% | Hawthorne | 4.7% |
| 10. | Bay View | 90.2% | Lafayette | 4.7% |
| 11. | John Muir | 89.9% | Edison | 3.8% |
| 12. | Anza | 89.5% | Guadalupe | 3.8% |
| 13. | Emerson | 88.0% | Cabrillo | 3.6% |
| 14. | John Swett | 85.7% | R. L. Stevenson | 3.1% |
| 15. | Starr King | 84.7% | Clarendon | 3.0% |
| 16. | I. M. Scott | 84.4% | Columbus | 2.4% |
| 17. | Fremont | 81.2% | Argonne | 2.3% |
| 18. | Raphael Weill | 75.4% | Douglas | 2.3% |
| 19. | Dudley Stone | 74.9% | P. A. Hearst | 1.6% |
| 20. | Andrew Jackson | 72.9% | West Portal | 1.4% |
| 21. | Farragut | 71.8% | Irving Washington | 1.3% |
| 22. | Lincoln | 65.7% | Commodore Stockton | 1.1% |
| 23. | John McLaren | 62.5% | Alvarado | 1.0% |
| 24. | McKinley | 61.7% | Parkside | 1.0% |
| 25. | Candlestick Cove | 54.2% | Jean Parker | 0.2% |
| 26. | San Miguel | 49.7% | Spring Valley | 0.1% |
| 27. | Daniel Webster | 47.3% | Garfield | 0.0% |

This table is derived from Plaintiffs' Exhibit 1, *Racial Estimates of Pupils Attending San Francisco Public Schools* [hereafter Exhibit 1], and Plaintiffs' Exhibit 2, *Estimates of the Racial Distribution of Pupils Attending San Francisco Public Schools Arranged in Descending Order of Percentages for 1969 and Trends Since 1966* [hereafter Exhibit 2]. The percentages are based on actual attendance for 1969, and represent the most current compilations available. It should be noted, in addition, that white students are a majority in most of the non-black schools, whereas no predominantly black school is as much as one-third white. In fact, only five of these schools are more than 15% white. Exhibit 2.

2. In addition to these fifty-four schools which the court finds to be racially identifiable, there are still other schools which are "racially imbalanced" within the standards set out by the State of California. Title 5, Section 14021(C) of the California Administrative Code provides that a school is racially imbalanced if the percentage of pupils of one or more racial or ethnic groups differs by more than fifteen percentage points from that in all the schools of the district. Since 28.7% of school pupils in the District are black, a school is racially imbalanced under state law if the percentage of black students is more than 43.7% or less than 13.7%. Eighty-six of the District's 102 schools are racially imbalanced on that standard. The only schools (sixteen out of 102) not racially imbalanced under the standard are: Bessie Carmichael, Commodore Sloat, Corbett, Diamond Heights, E. R. Taylor, Geary, Grant, Laguna Honda, Lawton, LeConte, Marshall, Miraloma, Noriega, Sunnyside, Winfield Scott, and Yerba Buena. Exhibits 1 and 2.

3. Segregation in identifiably black elementary schools in the District has increased in recent years. Defendants have been on notice of this increase

through annual reports of the District's Human Relations Officer. The following table illustrates the degree to which twenty-one schools which were identifiably black in 1964 have become increasingly so in the five year period from 1964 to 1969:

| School | % Black Students 1964 | % Black Students 1969 |
|---|---|---|
| Andrew Jackson | 66% | 72.9% |
| Bay View | 80% | 90.2% |
| Bret Harte | 76% | 91.2% |
| Burnett | 85% | 92.2% |
| Daniel Webster | 42% | 47.3% |
| Dudley Stone | 66% | 74.9% |
| Farragut | 61% | 71.8% |
| Fremont | 64% | 81.2% |
| Golden Gate | 95% | 96.1% |
| Hunters Point II | 94% | 96.8% |
| I. M. Scott | 63% | 84.4% |
| Jedediah Smith | 89% | 95.9% |
| John Muir | 85% | 89.9% |
| John Swett | 85% | 85.7% |
| Lincoln | 60% | 65.7% |
| McKinley | 43% | 61.7% |
| Ortega | 91% | 91.7% |
| San Miguel | 45% | 49.7% |
| Sheridan | 91% | 92.3% |
| Sir Francis Drake | 91% | 95.8% |
| Starr King | 57% | 84.7% |

*Compare* Plaintiffs' Exhibit 7, *Racial Estimates of Pupils Attending San Francisco Public Schools* (October, 1964) *with* Exhibit 1.

4. Without corrective action by the District, segregation will continue to increase. In September, 1966, the District contracted with Stanford Research Institute [hereafter SRI] to study alternative means by which racial imbalance in San Francisco's public schools might be diminished. In response to a request for admissions made by plaintiffs, defendants admitted that the SRI reports were prepared by qualified experts in the field of statistical research. The SRI study projected that there would be an increased number of black students which would result, absent corrective action by the District, in an increased number of black students at schools already predominantly black. That projection was not acted upon by the District, and the prediction has been borne out. Plain-

tiffs' Exhibit 24, *Population Projection to 1971*.

5. Black students in identifiably black schools do not perform as well as they would perform in an integrated school. SRI examined and evaluated both the United States Commission on Civil Rights survey, *Equality of Educational Opportunity* (popularly known as the Coleman Report) and the Commission's report, *Racial Isolation in the Public Schools*, as part of its study. SRI agreed with the findings of the Coleman Report that "[a]ttributes of other students account for far more variation in the achievement of minority group children than do attributes of school facilities and slightly more than do attributes of staff." Plaintiffs' Exhibit 26, *Educational Organization for Desegregation*, at 9 [hereafter Exhibit 26]. In short, SRI found that achievement of Negro students was increased with the increasing degree of integration. Elementary school teachers in the District support the findings of SRI by reporting that children transported from schools in predominantly black areas to other schools show an increase in their range of academic ability and interests. Plaintiffs' Exhibit 27, *Adapting to Changing Racial and Ethnic Composition: A Survey of San Francisco Teachers and Principals*, at 40 [hereafter Exhibit 27]. *See also*, Deposition of William L. Cobb, Ph.D., July 14, 1970, at 48 [hereafter "Cobb Deposition"]; Deposition of Isadore Pivnick, July 14, 1970, at 16–17 [hereafter "Pivnick Deposition"]. Pupils in the twenty-seven identifiably black schools in fact score lower on standardized reading tests than other pupils. Affidavit of Maureen O'Sullivan, Ph.D., July 16, 1970.

6. While integregation of schools would improve the academic performance of black children, it would have little or no adverse effect on the academic performance of white children. Plaintiffs' Exhibit 25, at 21, *Dimensions of Equality of Educational Opportunity* [hereafter Exhibit 25]; Exhibit 26, at 12–13.

7. Integration of public schools, including elementary schools, would decrease the number of dropouts, especially among black students who presently exhibit strong tendencies to drop out of school. Exhibit 25, at 1, 9–10.

8. Integration is most important at the elementary school level. Variations in the racial context of the elementary school make for a substantial and significant difference in subsequent academic success at higher grade levels. Affidavit of Alan B. Wilson, Ph.D., July 9, 1970; Deposition of Laurel E. Glass, Ph.D., July 20, 1970, at 20 [hereafter "Glass Deposition"]; Plaintiffs' Exhibit 31, *Educational Equality/Quality Report #1 . . . Program Alternatives* at 11. Furthermore, a United States Office of Education Survey shows that white students who first attend integrated schools early in their schooling are likely to value their association with black students more than students who attend schools with black children starting later in grades. Exhibit 25, at 21.

9. Segregation tends to stigmatize black children and lower their self esteem. This was the finding of the United States Supreme Court in Brown v. Board of Education, 347 U.S. 483, 494, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and it is supported by the findings of the Coleman Report and SRI. Plaintiffs' Exhibit 25, at 19. *See also*, Affidavit of Alan B. Wilson, July 9, 1970. Dr. Laurel E. Glass, a member of the San Francisco Board of Education since 1967 and its President in 1969, concludes that black children and their parents view the segregation in San Francisco as purposefully designed to separate the races. Dr. Glass concludes that this feeling reinforces the black child's feeling of inferiority. Glass Deposition, at 17–19.

10. The stigmatizing effect of public segregation is aggravated by the low proportion of black teachers and administrators hired by the District. Black personnel constitute only 9% of the District's full-time elementary school teachers and only 8% of its administrators. Exhibit 14; Plaintiffs' Exhibit 27, at 20.

11. Until very recently, the District has made few efforts to increase the number of black teachers in public elementary schools. Even after the Board of Education authorized the District to implement a program of racial balance among teachers in March, 1968, the Board's use of the National Teachers Exam as part of the selection process disqualified otherwise qualified black applicants and hindered the achievement of racial balance. Affidavit of Robert Seymour, July 17, 1970.

12. The stigmatizing effect of pupil assignment and hiring practices is further aggravated by the District's teacher and administrator assignment policies. Nine of the District's twelve black administrators are assigned to schools which are included in the twenty-seven schools found to be identifiably black schools. A disproportionately large number of black teachers—112 of the District's 175 black teachers—are assigned to the twenty-seven identifiably black schools. Thus, 64% of the black elementary school teachers are assigned to approximately 27% of the schools in the District. In contrast, only nine black teachers are employed in the twenty-seven schools listed above as identifiably non-black schools. Exhibit 14; Exhibit 27. These employment assignments are not voluntary; most of the black teachers would prefer assignment to non-black schools. Exhibit 27, at 36.

13. Teachers assigned to identifiably black elementary schools receive significantly lower salaries than teachers assigned to identifiably white schools. This lower salary level reflects a lower level of academic background, and a lower level of teaching experience. Glass Deposition, at 49; Cobb Deposition, at 104–105. The tables following compare the average monthly salaries of full-time teachers in identifiably black schools with those in identifiably non-black schools.

AVERAGE MONTHLY SALARIES OF TEACHERS IN
IDENTIFIABLY BLACK SCHOOLS

| School | | Salaries | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 551–600 | 601–650 | 651–700 | 701–750 | 751–800 | 801–850 | 851–950 | 951–1000 | 1001–1100 | 1101–1200 | 1201–1300 | |
| 1. Andrew Jackson | 1 | | | 4 | 1 | 1 | 3 | | | 5 | 2 | 17 |
| 2. Anza | 1 | | 2 | 4 | 3 | | 4 | 1 | 1 | 4 | 2 | 22 |
| 3. Bayview | 1 | 1 | 1 | 7 | 2 | 3 | 2 | 1 | | 3 | | 21 |
| 4. Bret Harte | 1 | | 2 | 4 | | 1 | 7 | 1 | 1 | 2 | 3 | 22 |
| 5. Burnett | | 1 | 6 | 6 | | 2 | 7 | 1 | 1 | 1 | | 25 |
| 6. Candlestick Cove | | 1 | 2 | | 1 | 1 | 1 | | 1 | 1 | 4 | 12 |
| 7. Daniel Webster | 3 | | 3 | 3 | 1 | 1 | 3 | | | 3 | 7 | 24 |
| 8. Dudley Stone | 3 | 2 | 4 | 6 | 1 | | 3 | 1 | | 3 | 2 | 25 |
| 9. Emerson | 1 | 1 | 1 | 1 | 1 | | 1 | 1 | 2 | 3 | 4 | 16 |
| 10. Farragut | 3 | | 1 | 2 | 1 | | 2 | | | 6 | 4 | 19 |
| 11. Fremont | 1 | 1 | 5 | 2 | 3 | 2 | 1 | | | | 2 | 17 |
| 12. Golden Gate | | | 3 | 6 | 4 | 1 | 7 | 2 | 2 | 4 | 3 | 32 |
| 13. Hunters Point II | | | 2 | 2 | | 1 | 2 | | 2 | 2 | 1 | 12 |
| 14. I. M. Scott | | | 1 | 1 | | | | | 1 | 1 | 1 | 5 |
| 15. Jedediah Smith 16. and Annex | 2 | 2 | 7 | 5 | 5 | | 3 | 2 | 3 | 4 | 1 | 34 |
| 17. John McLaren | 2 | 1 | 5 | 7 | 4 | 1 | 4 | 1 | | 4 | 1 | 30 |
| 18. John Muir | 1 | 4 | 7 | 9 | 4 | 1 | 5 | 1 | 2 | 3 | 1 | 38 |
| 19. John Swett | | | 2 | 7 | | 1 | | 1 | | 2 | 3 | 16 |
| 20. Lincoln | | | 1 | 1 | 3 | | | | | 1 | | 6 |
| 21. McKinley | 1 | | 2 | 8 | 2 | 1 | 1 | | 6 | 4 | 2 | 27 |
| 22. Ortega | 1 | | 3 | 7 | 2 | 2 | 3 | | 2 | 2 | 2 | 24 |
| 23. Raphael Weill | 2 | 2 | 5 | 6 | 9 | 2 | 4 | | 2 | 4 | 1 | 37 |
| 24. San Miguel | | 1 | 2 | 2 | 2 | 1 | 2 | 1 | 4 | 2 | 3 | 20 |
| 25. Sheridan | 2 | 2 | 8 | 5 | 2 | 1 | 2 | 1 | 1 | 1 | 1 | 26 |
| 26. Sir Francis Drake | 1 | 2 | 2 | 5 | 6 | 3 | 4 | 3 | 2 | 3 | 1 | 32 |
| 27. Starr King | 1 | | 3 | 6 | 1 | 2 | 3 | 1 | 1 | 3 | 3 | 24 |
| Totals | 28 | 21 | 80 | 116 | 58 | 28 | 74 | 19 | 34 | 71 | 54 | 583 |

AVERAGE MONTHLY SALARIES OF TEACHERS IN
IDENTIFIABLY NON-BLACK SCHOOLS

| School | Salaries | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 551–600 | 601–650 | 651–700 | 701–750 | 751–800 | 801–850 | 851–950 | 951–1000 | 1001–1100 | 1101–1200 | 1201–1300 | |
| 1. Garfield | | 1 | 2 | 1 | | 1 | 1 | 2 | | 6 | 2 | 16 |
| 2. Spring Valley | | 1 | | 3 | | 5 | | 2 | 2 | 8 | 6 | 27 |
| 3. Jean Parker | | | 1 | 3 | 1 | 2 | 3 | | 2 | 5 | 5 | 22 |
| 4. Parkside | | | 2 | 2 | | 2 | | 1 | 1 | 8 | 3 | 19 |
| 5. Alvarado | | | 2 | 5 | 1 | 1 | 4 | | 2 | 8 | 1 | 24 |
| 6. Commodore Stockton | 1 | 1 | 4 | 5 | | 4 | 11 | | 6 | 5 | 16 | 53 |
| 7. Washington Irving | | | | | 2 | 2 | 2 | | | 3 | 3 | 12 |
| 8. West Portal | | | 1 | 1 | 2 | 1 | 3 | | 2 | 4 | 8 | 22 |
| 9. P. A. Hearst | | | | | 1 | | | | 1 | 1 | 2 | 5 |
| 10. Douglas | | | 3 | 4 | | | 1 | 1 | 1 | | 1 | 11 |
| 11. Argonne | | | | | 3 | 3 | 1 | | 4 | 4 | 5 | 20 |
| 12. Columbus | | | | 4 | | 1 | 1 | 1 | 1 | 4 | | 12 |
| 13. Clarendon | | | 1 | 2 | 1 | 2 | 2 | | 1 | 2 | 2 | 13 |
| 14. R. L. Stevenson | | 1 | 1 | | 1 | | | | 1 | 8 | 4 | 16 |
| 15. Cabrillo | | | | 2 | 1 | | 2 | | | 2 | 2 | 9 |
| 16. Guadalupe | | | | 2 | | 1 | 1 | | 2 | 3 | 8 | 17 |
| 17. Edison | | | 7 | 1 | 5 | 1 | 4 | 1 | 2 | 3 | 1 | 25 |
| 18. Lafayette | | | 1 | 1 | 1 | 1 | 4 | 1 | 6 | 4 | 6 | 25 |
| 19. Hawthorne | 2 | 1 | 1 | 7 | 3 | 2 | 6 | 1 | | 5 | 2 | 30 |
| 20. Sutro | 1 | | 1 | 3 | 2 | | 3 | 1 | 1 | 4 | 6 | 22 |
| 21. Kate Kennedy | 1 | | | 5 | 1 | | 2 | 1 | 2 | | | 12 |
| 22. Excelsior | 1 | | | 1 | | | 2 | | | 1 | 2 | 8 |
| 23. Lakeshore | 1 | 1 | 1 | 4 | 2 | 1 | 1 | | 1 | 6 | 3 | 21 |
| 24. Fairmount | 1 | 1 | 3 | 4 | 3 | | 5 | 1 | 3 | 4 | 4 | 29 |
| 25. Glen Park | | | 1 | 2 | 1 | 1 | 2 | | 1 | 3 | 6 | 17 |
| 26. Alamo | | | 2 | 2 | | | 5 | 1 | 2 | 4 | 6 | 22 |
| 27. Cleveland | | | 3 | | 1 | 1 | 4 | | 2 | | 5 | 16 |
| Totals | 8 | 7 | 37 | 64 | 32 | 32 | 70 | 15 | 46 | 105 | 109 | 525 |

PERCENTAGE OF TEACHERS BY SALARY RANGE AND SCHOOL TYPE

| Type \ Salary Range | 551–600 | 601–650 | 651–700 | 701–750 | 751–800 | 801–850 | 851–950 | 951–1000 | 1001–1100 | 1101–1200 | 1201–1300 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Identifiably Black Schools | 5 | 3 | 14 | 20 | 10 | 5 | 12 | 3 | 6 | 12 | 9 |
| Identifiably Non-Black Schools | 2 | 1 | 7 | 12 | 6 | 6 | 13 | 3 | 9 | 20 | 21 |

The tables indicate that 50% of the teachers in non-black schools earn $1,000 or more per month, while only 27% of the teachers in predominantly black schools earn such salaries. Since teachers with the highest salaries are the most experienced, it is apparent that more highly qualified and experienced teachers are assigned to non-black schools. At the same time, many more inexperienced teachers are assigned to black schools than non-black ones. The tables show that 22% of the teachers in black schools are in the lowest three salary categories, compared to only 10% in non-black schools. Plaintiffs' Exhibit 14.

14. The lower educational achievement of children in identifiably black schools, as described in finding 6, is caused in part by the fact that the teachers in those schools have lower levels of academic background and teaching experience. The SRI found that the average educational preparation and years of teaching experience of teachers correlated positively with pupil achievement. Exhibit 26, at 10–11. *See also* Affidavit of Maureen O'Sullivan, Ph.D., July 16, 1970.

15. The San Francisco Board of Education, at least as early as February 4, 1969, had knowledge that teacher salaries, academic background, and teaching experience were lower in schools with predominantly black student bodies than in other schools, and that such factors tend to prejudice the educational achievement of the students in the predominantly black schools. Cobb Deposition, at 104; Exhibit 26, at 10–11. Despite such knowledge, the District has taken no corrective action.

16. The San Francisco Board of Education has had knowledge since 1967 of the recommendation of SRI that the highest quality teachers should be assigned to schools enrolling a large proportion of minority students. Plaintiffs' Exhibit 25, at 1. This recommendation has not been followed. *See* findings 13, 14.

17. Class size in predominantly white schools is significantly smaller than in predominantly black schools. While additional teachers may sometimes be assigned to predominantly black schools in which there are a number of children below grade level in the basic subjects, class size is not thereby reduced. Plaintiffs' Exhibit 22, *Report of the Ad Hoc Committee of the Board of Education to Study Ethnic Factors in the San Francisco Public Schools*, at 17.

18. School attendance zones have been and are drawn and modified by the District in ways which increase racial segregation significantly beyond demographic segregation. The District has the power to draw school attendance zones and exercises that power. Glass Deposition, at 20; Exhibit 22, at 7. It is not unusual for as many as twenty of the 102 school attendance zones to be revised in a single year. Exhibit 21B, *The Proper Recognition of a Pupil's Racial Background in the San Francisco Unified School District*, at 5 [hereafter Exhibit 21B]. The Board is empowered —indeed required—to consider the reduction of racial imbalance in decisions on districting. *See*, Title 5, California Administrative Code, Sections 14020–14021; Cobb Deposition, at 53–57. The Board had knowledge of means of redistricting which would substantially decrease racial imbalance. The SRI study showed that racial balance could be improved by as much as 10% in individual schools if attendance boundaries were redrawn. Plaintiffs' Exhibit 29, *Evaluation of Alternative Attendance Patterns to Improve Racial Balance*, at 13 [hereafter Exhibit 29]. In addition, districting decisions were made with the assistance of the District's Human Relations Officer, whose job it was to minimize segregation in public schools. Cobb Deposition, at 53–57. Despite this knowledge, and despite the power to redistrict, and the frequency of redistricting, the District never once revised school attendance districts for the purpose of improving racial balance. Cobb Deposition, at 54–57. Rather, it chose to maintain an official

districting policy established in 1936—"pupils in elementary schools shall be enrolled in the schools which are nearest or most convenient to their homes." Exhibit 21B, at 5.

19. The District constructed new buildings and additions to old buildings in a manner which perpetuated and exacerbated existing racial imbalance. For example:

a. In 1963 an addition to Golden Gate Elementary School was built. At that time, Golden Gate was predominantly black. Today, the school is 96.1% black. Cobb Deposition, at 84. Exhibit 1.

b. The San Francisco Board of Education has authorized a new school to be built to replace the Bay View School. This authorization was made despite the warning by Dr. William L. Cobb, Human Relations Officer of the District, that construction of a new school at the same location would result in increased segregation. Cobb Deposition, at 94. Bay View is currently 90.2% black. Exhibit 1.

c. In 1967 an addition was built to Raphael Weill Elementary School. At that time Raphael Weill was 71.9% black. It is now 75.4% black. Exhibits 1 and 2. Dr. Cobb was not consulted. Cobb Deposition, at 91.

d. An addition was built to Bret Harte Elementary School in 1970 despite the warning by Dr. Cobb that the addition would result in increased segregation. Cobb Deposition, at 79. Prior to construction, Bret Harte was 91.2% black. Exhibit 1.

e. In 1969 an addition was built to Burnett Elementary School. At that time, Burnett was 92.2% black. Exhibit 1.

20. Although the District had the power and duty under state law to consider the prevention and elimination of racial imbalance in its construction plans and choice of school sites, Title 5, California Administrative Code, Sections 14020–14021, the District has failed to consider racial balance in construction plans. Dr. Laurel E. Glass, a member of the Board of Education since 1967, and its President in 1969, testified that since she has been on the Board, racial factors have not been discussed when construction of a new school is planned. Glass Deposition, at 54. In many instances when new construction was planned, the District failed to consult the Human Relations Officer, its own officer given the responsibility of guarantying equal educational opportunity to all students. Cobb Deposition, at 11, 76. When the Human Relations Officer was consulted, his recommendations against the construction of certain buildings, based upon a showing of perpetuating or furthering racial imbalance, were disregarded by the District. See finding 19; Cobb Deposition, at 79, 94.

21. The Board has failed to respond to the recommendation of its own expert agency, SRI, on racial balance. The SRI recommendations described in findings 16 and 18 [teachers and districting] are just a few of those which have been ignored. The SRI, in 1966, presented the District with twelve specific attendance alternatives designed to reduce segregation in the schools. These alternatives ranged from plans as simple as redistricting to those as complex as using cross-bussing to pair schools with predominantly black student bodies with schools with predominantly white student bodies in order to achieve racial balance. Exhibit 29. None of these alternatives has been pursued.

22. Recommendations made by the Report of the Citizens' Advisory Committee to the Superintendent's Task Force Studying Education Equality/Quality and Other Proposals [Plaintiffs' Exhibit 32] have not been followed. That committee's key proposal for significantly improving racial and ethnic balance at the elementary level was the establishment of two complexes of elementary schools known as the Richmond Elementary Complex and the Park-South Elementary Complex. Exhibit 32, at 10. As worked out and proposed by the Committee, the Richmond

Complex would have included at least twelve schools having an enrollment of 6800 students, and Park-South would have included at least eight schools with 4200 students. Exhibit 32, at 9.

Because the Advisory Committee viewed the complexes as a major achievement in integration, the Superintendent of Schools urged the District to implement the complexes in September, 1970. Exhibit 32, at 7; Plaintiffs' Exhibit 33, *Educational Equality/Quality Report #3. Time for Action!* On June 10, 1969, the District accepted the recommendation of the Superintendent with the understanding that implementation of the complexes in September, 1970, was conditioned on firm commitments of adequate funding. Plaintiffs' Exhibit 34, *Educational Equality/Quality, Progress Report on the Planning for Implementation of the Superintendent's Educational Equality/Quality Report #3— Time for Action—Approved in Principle by Board of Education, June 10, 1969* [hereafter Exhibit 34]. Although the Superintendent recommended that half the funding for the complexes be supplied by the District and half by outside sources, the District, while able to carry out that recommendation, agreed to provide only $1,200,000 of the estimated $2,800,000 necessary to fully implement the complexes. Exhibit 34, at 10–12; Plaintiffs' Exhibit 35, *Educational Equality/Quality, Progress Report on Park-South and Richmond Complexes.* Ultimately, the Board decided that there were insufficient funds to proceed with both complexes and determined to proceed only with the Richmond Complex and to indefinitely postpone Park-South. Plaintiffs' Exhibit No. 38, *Minutes, Special Meeting, Board of Education, Wednesday, May 27, 1970, 7:00 P.M.*

In voting to postpone Park-South and proceed only with the Richmond Complex, the Board voted against the recommendation of the Superintendent that both complexes be implemented within the limits of the budget. The Board also voted against the recommendation of the Citizens Advisory Councils of both complexes, which made the same recommendation as the Superintendent. These Advisory Councils were groups of lay people from each of the complex areas appointed by Isadore Pivnick, Assistant Superintendent for Innovative Planning and coordinator of the complexes, to advise him on community feelings about the complexes. Plaintiffs' Exhibit 37, *Minutes, Regular Meeting, Board of Education, Tuesday, May 19, 1970, 4:00 P.M.*; Glass Deposition, at 59–60, 66; Pivnick Deposition, at 29, 55–56.

Had Park-South been implemented, racial imbalance would have been eliminated in the eight schools comprising the complex. Cobb Deposition, at 97. Two of the twenty-seven schools with identifiably black student bodies, Dudley Stone (74.9% black) and McKinley (61.7% black), would have been included in the complex and the percentage of blacks in those schools would have been reduced to approximately 35%. Pivnick Deposition, at 25. Nevertheless, the Board decided to postpone indefinitely implementation of the Complex for lack of funding.

Much of the difficulty in raising funds for the complexes is attributable to the Board's reluctance to commit irrevocably its own funds to the project. Pivnick Deposition, at 38–39. Despite the funding problems, enough money had been raised to provide for both complexes, although not all of the quality components upon which the Board had insisted could have been guaranteed. Pivnick Deposition, at 53. In choosing, on or about May 27, 1970, to postpone implementation of Park-South, the District not only rejected the recommendation of the Superintendent, the Citizens Advisory Councils, and the Citizens' Advisory Committee to the Superintendent's Task Force, but also concomitantly delayed desegregation of all other schools in the city. Pivnick Deposition, at 56–57.

23. While the District has bussed public school children since 1946 for the purpose of eliminating overcrowded conditions in certain schools, bussing has nev-

er been utilized to eradicate or reduce segregation. Plaintiffs' Exhibit 13, *A Twenty-Year History of Pupil Transportation in the San Francisco Public Schools*; Cobb Deposition, at 61. District bussing has been restricted to moving black students to predominantly white schools—never the reverse. Exhibit 22, at 13–14. Recommendations to the District by the Human Relations Officer that bussing be utilized to achieve racial balance in the schools have been rejected. Cobb Deposition, at 63.

24. Aside from implementation of the Richmond Complex, the District has neither made nor accepted any concrete proposals to improve the racial balance of the schools. The only action taken by the District has been to support an Ocean View-Merced Heights project involving six schools, and to support a Hunters Point Redevelopment Project. Glass Deposition, at 26. The Ocean View-Merced Heights project has been a disaster resulting in increased rather than decreased segregation. In fact, four of the six schools therein involved number among the twenty-seven identifiably black schools. Glass Deposition, at 30; Exhibit 1. The Hunters Point Redevelopment Project calls for bringing light industry into the Hunters Point area to generate jobs, for improved housing, and ultimately for integration of the schools, by drawing white families into the area in search of employment. Glass Deposition, at 26. While providing a possibility of integration at some distant future time, this project by no means even guarantees that.

25. A tracking system or any other system of classifying students which causes students of different races to be separated into different classes, or students of disparate abilities to be classed separately, would defeat the obectives of integration. Exhibit 27, at 41.

## IV. CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter of this action under the Civil Rights Act, 28 U.S.C. § 1343(3).

2. Rights guaranteed by the Fourteenth Amendment of the United States Constitution apply to all public elementary school systems. Those rights may not be infringed by State or local law authorizing or permitting or providing for racial discrimination. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 12, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); United States v. School District 151, 286 F.Supp. 786, 797 (N.D.Ill.), aff'd, 404 F.2d 1125 (7th Cir. 1968); Taylor v. Board of Education, 191 F.Supp. 181, 182–183 (S.D. N.Y.), aff'd, 294 F.2d 36 (2d Cir.), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L. Ed.2d 339 (1961); Clemons v. Board of Education, 228 F.2d 853, 859 (6th Cir. 1956); Spangler v. Pasadena City Board of Education, 311 F.Supp. 501, 521 (C.D. Cal. 1970).

3. This Court has jurisdiction to hear and to decide all issues concerning alleged discrimination in the schools of the District, including policies involving the assignment of students, the allocation and hiring of faculty and administrators, and the location and construction of schools. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); United States v. School District 151, 286 F.Supp. 786 (N.D.Ill.), aff'd, 404 F.2d 1125 (7th Cir. 1968); United States v. Jefferson County Board of Education, 372 F.2d 836, aff'd en banc, 380 F.2d 385 (5th Cir. 1967), cert. denied, sub nom. Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967); Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala.), aff'd, sub nom. Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967).

4. By assigning the least experienced and least qualified teachers to schools with predominantly black student bodies, and by maintaining larger classes in these schools than in schools with predominantly white student bodies, the District has denied black students equal protection of the law. Coppedge v. Franklin County Board of Education, 273

F.Supp. 289, 299 (E.D.N.C.1967), aff'd, 394 F.2d 410 (4th Cir. 1968); Kelley v. Altheimer, 378 F.2d 483, 499 (8th Cir. 1967); Spangler v. Pasadena City Board of Education, 311 F.Supp. 501 (C.D.Cal. 1970).

5. The fact that the District assigns the great majority of its black teachers to schools where the students are predominantly black, constitutes a practice of advancing segregation and places upon the District the burden of showing that it did not cause such segregation, especially in light of the fact that most black teachers want other assignments. Davis v. School District, 309 F.Supp. 734, 743 (E.D.Mich.1970); cf., Chambers v. Hendersonville City Board of Education, 364 F.2d 189, 192 (4th Cir. 1966); Rolfe v. County Board of Education, 391 F.2d 77 (6th Cir. 1968). This burden has not been met by the District and the Court accordingly concludes that segregation of school faculties is the direct result of District action.

6. Assignment of teachers on a racial basis so that teachers are assigned to schools attended by children of their race tends to establish racially identifiable schools. Such assignment deprives students of their right to be free of racial discrimination in the operation of public elementary schools and is de jure segregation in violation of the Fourteenth Amendment. Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); Bradley v. School Board, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965); Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); United States v. School District 151, 286 F.Supp. 786, 797 (N.D. Ill.), aff'd, 404 F.2d 1125 (7th Cir. 1968); Spangler v. Pasadena City Board of Education, 311 F.Supp. 501, 523 (C.D. Cal.1970); Davis v. School District, 309 F.Supp. 734, 744 (E.D.Mich.1970); Hobson v. Hansen, 269 F.Supp. 401, 501–503 (D.D.C.1967), appeal dismissed, 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1968).

7. Assignment of 75% of black school administrators to the same schools where most black teachers are assigned, and where most students are black, increases the segregated nature of these schools, and therefore deprives students of their right to be free of racial discrimination in the operation of public schools and is de jure segregation in violation of the Fourteenth Amendment. United States v. School District 151, 286 F.Supp. 786, 798–799 (N.D.Ill.), aff'd, 404 F.2d 1125 (7th Cir. 1968); Coppedge v. Franklin County Board of Education, 273 F.Supp. 289, 299, 300 (E.D.N.C. 1967), aff'd, 394 F.2d 410 (4th Cir. 1968); Spangler v. Pasadena City Board of Education, 311 F.Supp. 501, 523 (C.D. Cal.1970); Hobson v. Hansen, 269 F. Supp. 401, 501–503 (D.D.C.1967), appeal dismissed, 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1968).

8. Defendants are under a constitutional obligation to take affirmative remedial action to desegregate the faculties and administrative staffs of the public elementary schools forthwith. United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969); United States v. School District 151, 286 F.Supp. 786, 797 (N.D.Ill.), aff'd, 404 F.2d 1125 (7th Cir. 1968); Clark v. Board of Education, 369 F.2d 661, 669 (8th Cir. 1966); United States v. Jefferson County Board of Education, 372 F.2d 836, 893, aff'd en banc, 380 F.2d 385 (5th Cir. 1967), cert. denied, sub nom. Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967); Spangler v. Pasadena City Board of Education, 311 F.Supp. 501, 523 (C.D.Cal. 1970); Davis v. School District, 309 F.Supp. 734, 744 (E.D.Mich.1970).

9. The responsibility for faculty and administration desegregation is defendants', not the teachers and administrators. The constitutional prohibition against segregation in public schools may not be made contingent upon the preferences of teachers or the administrative staff. If necessary to further desegregation, faculty and administrators must be assigned involuntarily to schools. United States v. School Dis-

trict 151, 286 F.Supp. 786, 798 (N.D.Ill.), aff'd, 404 F.2d 1125 (7th Cir. 1968); United States v. Board of Education, 396 F.2d 44 (5th Cir. 1968); Davis v. Board of School Commissioners, 393 F.2d 690 (5th Cir. 1968); Spangler v. Pasadena City Board of Education, 311 F.Supp. 501, 523 (C.D.Cal.1970); Davis v. School District, 309 F.Supp. 734, 744 (E.D.Mich.1970); Kier v. County School Board, 249 F.Supp. 239 (W.D.Va.1966).

10. The evidence presented by the parties is insufficient to demonstrate the reasons why there are unconscionably few black teachers and administrators presently employed by the District. Having found, however, that other acts of defendants resulted in *de jure* segregation, the Court has the power to ensure that defendants will not discriminate against blacks in hiring future teachers and administrators, and the power to require the District to actively pursue a policy of hiring blacks for these positions. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 12, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Brown v. Board of Education, 349 U.S. 294, 300–301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); Hobson v. Hansen, 269 F.Supp. 401, 516 (D.D.C.1967), appeal dismissed, 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1968).

11. The manner in which the District formulated and modified attendance zones for elementary schools had the inevitable effect of perpetuating and exacerbating existing racial segregation of students. Such conduct constitutes *de jure* discrimination in violation of the Fourteenth Amendment. United States v. School District 151, 286 F.Supp. 786, 795–796, 798 (N.D.Ill.), aff'd, 404 F.2d 1125 (7th Cir. 1968); Brewer v. School Board of City of Norfolk, 397 F.2d 37, 40–42 (4th Cir. 1968); United States v. Jefferson County Board of Education, 372 F.2d 836, 867–868 (5th Cir. 1965), aff'd en banc, 380 F.2d 385 (1966), cert. denied, sub nom. Caddo Parish School Bd. v. United States, 389 U.S. 840, 88 S.Ct.

67, 19 L.Ed.2d 103 (1967); Taylor v. Board of Education, 294 F.2d 36 (2d Cir.), cert. denied, 368 U.S. 940, 82 S.Ct 382, 7 L.Ed. 339 (1961); Spangler v. Pasadena City Board of Education, 311 F.Supp. 501, 522 (C.D.Cal.1970); Davis v. School District, 309 F.Supp. 734, 744 (E.D.Mich. 1970).

12. By building new elementary schools and additions to old schools in a manner that perpetuated and exacerbated existing segregation of elementary school pupils, the District caused *de jure* segregation in violation of the Fourteenth Amendment. Swann v. Charlotte-Mecklenburg Board of Education, 402 U. S. 1, 12, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); United States v. Montgomery County Board of Education, 395 U.S 225, 231, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969); Lee v. Macon County Board of Education, 267 F.Supp. 458, 472, 480 (M.D.Ala.), aff'd, sub nom. Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967); United States v. Board of Public Instruction, 395 F.2d 66, 69 (5th Cir. 1968); United States v. School District 151, 286 F.Supp. 786, 800 (N.D.Ill.), aff'd, 404 F.2d 1125 (7th Cir. 1968); Brewer v. School Board of City of Norfolk, 397 F.2d 37 (4th Cir. 1968); Spangler v. Pasadena City Board of Education, 311 F.Supp. 501, 517–519 (C.D.Cal.1970); Davis v. School District, 309 F.Supp. 734, 741 (E.D.Mich. 1970).

13. A school board may not, consistently with the Fourteenth Amendment, maintain segregated elementary schools or permit educational choices to be influenced by a policy of racial segregation in order to accommodate community sentiment or the wishes of a majority of voters. Cooper v. Aaron, 358 U.S. 1, 12–13, 15–16, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958); Lucas v. Forty-Fourth General Assembly, 377 U.S. 713, 736–737, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); Hall v. St. Helena Parish School Board, 197 F.Supp. 649, 659 (E.D.La.), aff'd, 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d

521 (1961); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); United States v. School District 151, 286 F.Supp. 786, 798 (N.D. Ill.), aff'd, 404 F.2d 1125 (7th Cir. 1968); Spangler v. Pasadena City Board of Education, 311 F.Supp. 501, 523 (C.D.Cal. 1970).

14. This Court has pendent jurisdiction over plaintiffs' claim that racial segregation also violates state law. United Mine Workers of America v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Rosado v. Wyman, 397 U.S. 397, 404–405, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); Atlantic Coast Line Railroad Company v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 295, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970); Gem Corrugated Box Corp. v. National Kraft Container Corp., 427 F.2d 499 (2d Cir. 1970); Miller Equipment Co. v. Colonial Steel and Iron Co., 383 F.2d 669 (4th Cir. 1967). *See also* 42 U.S.C. § 1988.

15. Plaintiffs are entitled to seek relief in federal court under the Civil Rights Act, even though they may not have exhausted all the administrative and judicial remedies made available by the State of California. King v. Smith, 392 U.S. 309, 312 n. 4, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Monroe v. Pape, 365 U.S. 167, 180–183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

16. It is the declared policy of the State of California, expressed through the State Board of Education that:

[P]ersons or agencies responsible for the establishment of school attendance centers or the assignment of pupils thereto shall exert all effort to prevent and eliminate racial and ethnic imbalance in pupil enrollment. The prevention and elimination of such imbalance shall be given high priority in all decisions relating to school sites, school attendance areas and school attendance practices.

Title 5, California Administrative Code, Section 14020.

17. When one or more schools in a school district is racially imbalanced with respect to one or more racial or ethnic groups—"imbalance" being defined as in Finding 2—it is the responsibility of that school district under California law to consider alternative plans to reduce the imbalance, and to exert all effort to prevent and eliminate it. Title 5, California Administrative Code, Sections 14020–14021.

18. Defendants have failed to comply with California law in that they have failed to adopt any of the alternatives suggested by various sources—*e. g.*, SRI, Superintendent, Human Relations Officer—which would have reduced the imbalance in the District's elementary schools, and have failed to exert substantial effort to reduce existing imbalances.

19. California law also requires a School District to consider the effects on the racial composition of schools caused by building or enlarging schools, and to exert all effort to prevent and eliminate racial imbalance. Title 5, California Administrative Code, Sections 14020, 14021 (a) (4).

20. Defendants have failed to comply with California law in that they have built new schools and enlarged old ones without considering the effect such construction would have on the racial composition of the schools. *Id.*